462 F.2d 1058
 In the Matter of Carolyn BRADLEY et al., Appellees,
v.
The SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA, et al., Appellees,
v.
The SCHOOL BOARD OF CHESTER-FIELD COUNTY et al., Appellants.
National Education Association, Amicus Curiae.
American Civil Liberties Union, American Civil Liberties
Union of Virginia, Amicus Curiae.
United States of America, Amicus Curiae. Congress of Racial
Equality, Amicus Curiae.
In the Matter of Carolyn BRADLEY et al., Appellees,
v.
The SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA, et al., Appellees,
v.
The SCHOOL BOARD OF HENRICO COUNTY et al., Appellants.
National Education Association, Amicus Curiae.
American Civil Liberties Union, American Civil Liberties
Union of Virginia, Amicus Curiae.
United States of America, Amicus Curiae.
Congress of Racial Equality, Amicus Curiae.
In the Matter of Carolyn BRADLEY et al., Appellees,
v.
The SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA, et al., Appellees,
v.
The STATE BOARD OF EDUCATION OF the COMMONWEALTH OF VIRGINIA
et al., Appellants.
National Education Association, Amicus Curiae.
American Civil Liberties Union, American Civil Liberties
Union of Virginia, Amicus Curiae.
United States of America, Amicus Curiae.
Congress of Racial Equality, Amicus Curiae,
In the Matter of Carolyn BRADLEY et al., Appellees,
v.
The SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA, et al., Appellees,
v.
Dawn GAULDIN, an infant, by her next friend and mother,
Judith Gauldin, and others, parents and school
children of Chesterfield County, Appellants.
National Education Association, Amicus Curiae.
American Civil Liberties Union, American Civil Liberties
Union of Virginia, Amicus Curiae.
United States of America, Amicus Curiae.
Congress of Racial Equality, Amicus Curiae.
 Nos. 72-1058 to 72-1060 and 72-1150.
 United States Court of Appeals,
 Fourth Circuit.
 Argued April 13, 1972.
Decided June 5, 1972.
 
 Philip B. Kurland, Chicago, Ill. (Andrew P. Miller, Atty. Gen. of Va., William G. Broaddus, D. Patrick Lacy, Jr., Asst. Attys. Gen., on brief for The State Board of Education and the Superintendent of Public Instruction; Frederick T. Gray, Walter E. Rogers, Richmond, Va., and Oliver D. Rudy, Commonwealth's Atty., Chesterfield County, on brief for The Board of Supervisors of Chesterfield County; J. Segar Gravatt, Blackstone, Va., on brief for The School Board of Chesterfield County; R. D. McIlwaine, III, L. Paul Byrne, Richmond, Va., J. Mercer White, Jr., County Atty., Henrico County, on brief for The Board of Supervisors of Henrico County and the School Board of Henrico County), for appellants.
 George B. Little, Richmond, Va., (John H. Obrion, Jr., James K. Cluverius, and Browder, Russell, Little, & Morris, Richmond, Va., and Conard B. Mattox, Jr., City Atty., on brief), and Norman J. Chachkin, New York City, (Louis R. Lucas, Memphis, Tenn., William L. Taylor, Richmond, Va., Jack Greenberg, James M. Nabrit, III, New York City, James R. Olphin, and M. Ralph Page, Richmond, Va., on brief), for appellees.
 Stephen J. Pollak, Richard M. Sharp, David Rubin, and Shea & Gardner, Washington, D. C., on brief for amicus curiae, The National Education Association.
 Richard V. Falcon, David S. Bogen, Baltimore, Md., Melvin L. Wulf, Sanford Jay Rosen, American Civil Liberties Union, New York City, and Philip Hirschkop, Alexandria, Va., on brief for amicus curiae American Civil Liberties Union, American Civil Liberties Union of Virginia.
 Brian P. Gettings, U. S. Atty., David L. Norman, Asst. Atty. Gen., and Brian K. Landsberg, Atty., Dept. of Justice, on brief for amicus curiae, The United States.
 Theo Walker Mitchell, Greenville, S. C., and William C. Chance, Floyd B. McKissick, Charles S. Conley, and Roy Innis, National Director, Victor Solomon, Associate National Director, Congress of Racial Equality, on brief, for amicus curiae, The Congress of Racial Equality.
 Before HAYNSWORTH, Chief Judge, and BRYAN, WINTER, CRAVEN, RUSSELL and FIELD, Circuit Judges, sitting en banc.
 CRAVEN, Circuit Judge:
 
 
 1
 May a United States District Judge compel one of the States of the Union to restructure its internal government for the purpose of achieving racial balance in the assignment of pupils to the public schools? We think not, absent invidious discrimination in the establishment or maintenance of local governmental units, and accordingly reverse.
 
 
 2
 This is a new aspect of an old school case begun in 1961.[1] Neither the parties to this appeal nor the numerous amici permitted to file briefs question the duty of the Richmond School Board to achieve a unitary school system. Brown v. Board of Education (Brown I), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown v. Board of Education (Brown II), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Indeed, it is virtually conceded and established beyond question that, albeit belatedly, Richmond has at this juncture done all it can do to disestablish to the maximum extent possible[2] the formerly state-imposed dual school system within its municipal boundary.
 
 
 3
 What is presented on appeal is whether the district court may compel joinder with Richmond's unitary school system two other school districts (also unitary) in order to achieve a greater degree of integration and racial balance. The district judge felt compelled to order consolidation of the three school units partly because of his concern with what seemed to him an unfortunate racial balance in the three separate systems and partly because he felt this racial balance was the result of invidious state action. In his concern for effective implementation of the Fourteenth Amendment he failed to sufficiently consider, we think, a fundamental principle of federalism incorporated in the Tenth Amendment and failed to consider that Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 2d 554 (1971), established limitations on his power to fashion remedies in school cases.
 
 I.
 
 4
 The current phase of the case began on March 10, 1970. On that date the black plaintiffs filed a motion for further relief, and on March 19, 1970, in response to inquiry by the court, the Richmond School Board filed a statement to the effect that "they had been advised that the public schools of the City of Richmond are not being operated as unitary schools in accordance with the most recent enunciations of the Supreme Court of the United States." The board thus conceded that its previously implemented plan of integration, largely based on freedom of choice, which plan had been approved by the district court on March 30, 1966, was insufficient under Green v. School Board of New Kent County, supra, to constitute a unitary school system. The school board waived a hearing and further advised the court that it had "requested the Department of Health, Education and Welfare to make a study and recommendation as to a plan which would insure the operation of the unitary school system in compliance with the decisions of the United States Supreme Court" said plan to be ready by May 1, 1970. On June 26, 1970, the court rejected the proposed HEW plan and granted leave to the Richmond School Board to submit another plan if they so desired. That plan was filed on July 23, 1970, and a hearing on its adequacy was conducted on August 7, 1970. Because of the imminence of the beginning of the school year 1970-71, the court approved this second plan purely on an interim basis. After several additional hearings, another plan, designated Plan III, was approved in April 1971 for the school year 1971-72. The Richmond city schools are currently operating under this plan. In Bradley v. School Board of the City of Richmond, 325 F.Supp. 828, 835 (1971), the district judge, having carefully compared the three proposed plans, plus a fourth one, called the Foster Plan, concluded that Plan III, if successfully implemented, would eliminate "the racial identifiability of each facility to the extent feasible within the City of Richmond." The court added that "this is the extent, under current law, of the affirmative obligation governing use of its [school board] available powers: . . ."
 
 
 5
 Meanwhile, administrators of the Richmond school system were having second thoughts, prompted perhaps by a colloquy between court and counsel having to do with possible consolidation of the Richmond school system with the adjoining school systems of Chesterfield County and Henrico County. Under the approved Plan III it was projected that the percentage of whites in high schools would range from 21 percent to 57 percent and the percentage of blacks from 43 percent to 79 percent, that the range in middle schools would be 19 percent to 61 percent whites and 39 percent to 81 percent black, and the elementary range would be from 20 percent to 66 percent white and from 34 percent to 80 percent black. Such arithmetic pointed up the obvious: that if the heavily white school population of the adjoining counties could be combined with the majority black school population of Richmond a "better" racial mix would result. Thus, on November 4, 1970, the city filed a "motion to compel joinder of parties needed for just adjudication under Rule 19." The court allowed the motion and the filing of an amended complaint directed toward relief against these new respondents: the Board of Supervisors of Chesterfield County, the Board of Supervisors of Henrico County, the School Board of Chesterfield County, the School Board of Henrico County, the State Board of Education, and the Superintendent of Public Instruction. On January 10, 1972, came judgment: all defendants, including the State Board of Education, the State Superintendent of Public Instruction, the school boards of the two counties and the city, the boards of supervisors of the two counties, and the City Council of the city, were enjoined to create a single school division composed of the city and the two counties. In great detail, set out on some seven pages, methods and procedures for effecting consolidation were specified to be completed within time limitations. It is from this injunction that the state and county defendants prosecute this appeal.
 
 II.
 
 6
 Were we to sustain this injunctive decree, the result would be one of the largest school districts in America. In the fall of 1970 the Richmond school district had 47,824 pupils and was the third largest school district in Virginia. The Henrico school division had 34,080 and was the fifth largest in Virginia, and the Chesterfield school district had 24,069 pupils and was the twelfth largest in Virginia. Richmond has a geographical area of 63 square miles, Henrico 244 square miles, and Chesterfield 445 square miles. The mandated school consolidation would thus create a district containing over 750 square miles and in excess of 100,000 pupils. In the fall of 1970 there were only 28 school districts in the entire United States containing 100,000 or more pupils, approximately 0.2 percent of all school districts in the nation. Presently in Virginia there is only one school district (Fairfax County) containing more than 100,000 pupils. The second largest is Norfolk with 55,739 pupils, and, as stated, Richmond is third with 47,824 pupils.
 
 
 7
 For the school year 1970-71, the Richmond City School Board operated 57 schools, and the racial composition of the pupil population was approximately 64 percent black and 36 percent white. Henrico operated 43 schools, and the racial composition was approximately 92 percent white and eight percent black. Chesterfield operated 28 schools, and the racial composition was approximately 91 percent white and nine percent black.
 
 
 8
 Beginning at page 186 of his opinion, 338 F.Supp. 67, the district judge sets out in some detail the theory advanced by various witnesses of a "viable racial mix."[3] In order to effect such a mix, the court approved, subject to trial and error, a lottery program similar to the national draft.
 
 
 9
 Under the lottery program developed by the Richmond officials, whether a child is among those normally assigned to the school in his attendance zone who would be transported elsewhere is determined by birth date. A single birthday or 366 might be picked out of a hat. Then, starting with the first picked and taking all born subsequently, or following the list of 366 in order drawn, sufficient pupils are chosen to meet the quota of those to be transported out. After the child's status is determined according to the lottery, he would remain with his fellows during his tenure at each level of school. A new lottery would be conducted for him as he moved into middle school and later into high school.
 
 
 10
 Bradley, at 187.
 
 
 11
 In his concern to achieve a "viable racial mix," the district court did not rule out the possibility of joining additional counties, e.g., Hanover County (Bradley, at 193), and indeed ventured the opinion that "due to the sparsity of population in some of the adjoining counties, the task will not be difficult."
 
 
 12
 Bradley, at 192.
 
 
 13
 It is not clear from the district court's decision the weight given to the testimony of various witnesses. Some importance, however, undoubtedly attaches to the testimony of Dr. Pettigrew adopted in part by the court below.[4]
 
 
 14
 To achieve "integration", in Dr. Pettigrew's terms one must have the "mix plus positive inter-action, as we would want to say, between whites and blacks." Current research indicates that in order to achieve these benefits there is an optimum racial composition which should be sought in each school. Dr. Pettigrew placed this at from 20 to 40% black occupancy. These figures are not at all hard and fast barriers, but merely indicate to the racial composition range in which inter-action of a positive sort is the more likely to occur. Social science is not such an exact science that the success or failure of integration depends upon a few percentage points. The low level of 20% fixes the general area below which the black component takes on the character of a token presence. Where only a few black students are in the particular school, there simply are insufficient numbers for them to be represented in most areas of school activities. Such participation would be crucial to the success of integration. The high level of 40% is linked not to the likely behavior of the students so much as it is to the behavior of their parents. When the black population in a school rises substantially above 40%, it has been Dr. Pettigrew's experience that white students tend to disappear from the school entirely at a rapid rate, and the Court so finds. This is only possible, of course, when alternative facilities exist with a lesser black proportion where the white pupils can be enrolled. The upper limit, then, relates to stability.
 
 
 15
 Bradley, at 194.
 
 
 16
 The district court concluded (Bradley, at 185) that "taking the three jurisdictions together," (Chesterfield, Henrico, Richmond) over the past ten years "the racial proportions have remained quite constant, at about 67% white and 33% black." The court stated that he rejected the notion that a goal of placing 20 to 40 percent black students in each school could be characterized as the imposition of a fixed racial quota,[5] but did note that "if the goal were achieved, Negroes would be in a minority in each school." Bradley, at 186. He emphasized that this corresponded to the demographic pattern of the units combined, and, indeed, corresponded to the racial balance of the nation as a whole. However, in discussing the Richmond Metropolitan School Plan, the district court also emphasized the fact that without consolidation, very few pupils in the city or the counties would attend schools whose racial mix corresponded to that considered "viable" by Dr. Pettigrew, while with consolidation under the proposed plan,
 
 
 17
 97% of the black students in the area would attend schools in the range of 20-40% black; the remainder would be in 15-20% black schools. Under that plan 92.5% of the white students in the area would be in schools of the optimum mix determined by Dr. Pettigrew, and 7.5% would be in schools with a 15-20% black enrollment.
 
 
 18
 Bradley, at 195.
 
 
 19
 The desire of the district judge to achieve such a racial mix is quite understandable since the evidence seemed to indicate its workability in practice. But we think the adoption of the Richmond Metropolitan Plan in toto by the district court, viewed in the light of the stated reasons for its adoption, is the equivalent, despite disclaimer, of the imposition of a fixed racial quota. The Constitution imposes no such requirement, and imposition as a matter of substantive constitutional right of any particular degree of racial balance is beyond the power of a district court. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. at 24, 91 S.Ct. 1267; Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J.1971), aff'd mem. 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972).
 
 III.
 
 20
 The boundaries of the three school districts, Richmond, Chesterfield and Henrico, have always been (for more than 100 years) coterminous with the political subdivision of the City of Richmond, the County of Chesterfield and the County of Henrico. The boundaries have never been changed except as occasioned by annexation of land within the two counties caused by the expansion and growth of the City of Richmond. The most recent annexation has resulted in adding to the school population of Richmond 10,240 pupils, of which approximately 9,867 are white.[6] It is not contended by any of the parties or by amici that the establishment of the school district lines more than 100 years ago was invidiously motivated. We have searched the 325-page opinion of the district court in vain for the slightest scintilla of evidence that the boundary lines of the three local governmental units have been maintained either long ago or recently for the purpose of perpetuating racial discrimination in the public schools. As the brief of the United States points out, to the extent, if at all, there are district court findings of inter-district discrimination, they are delineated with such a "broad brush" as to make "it difficult on review to say precisely what the violation, if any, was." We agree with the position of the United States that "this is not primarily a case about segregation required by law, because state law has never required segregation as between Richmond and the neighboring school systems."
 
 
 21
 With the discontinuance, at the instigation of HEW, of Chesterfield County's participation in the Matoaca Laboratory School, every black child in Chesterfield County attends a racially desegregated facility, and the school system is unitary. As early as 1969, HEW was satisfied that Henrico County was operating a unitary nonracial school system, and by June 30, 1971, with the elimination of the racial identifiability of the Central Garden School, Henrico County complied in all respects with the suggestions of HEW. It is thus established that in each of the three school districts the formerly dual system of schools has been disestablished and effectively replaced with a unitary school system within which no child is excluded from any school by reason of his race. The issue, also as urged by the United States, is whether the maintenance of three separate unitary school divisions constitutes invidious racial discrimination in violation of the Fourteenth Amendment.
 
 
 22
 It is urged upon us that within the City of Richmond there has been state (also federal) action tending to perpetuate apartheid of the races in ghetto patterns throughout the city, and that there has been state action within the adjoining counties also tending to restrict and control the housing location of black residents. We think such findings are not clearly erroneous, and accept them. Just as all three units formerly operated dual school systems, so likewise all three are found by the district court to have in the past discriminated against blacks with respect to places and opportunity for residence. But neither the record nor the opinion of the district court even suggests that there was ever joint interaction between any two of the units involved (or by higher state officers) for the purpose of keeping one unit relatively white by confining blacks to another. What the district court seems to have found, though this is not clear, is that there has been in the past action by the counties which had a tendency to keep blacks within the boundaries of the City of Richmond and excluded them from the counties. In arriving at this conclusion, the district court seemed to place great reliance on the selection of new school construction sites over the years, racially restrictive covenants in deeds, the nonparticipation of the counties in federally assisted low income housing, and testimony concerning private acts of discrimination in the sale of housing. If the district court's theory was that the counties were thus keeping blacks in Richmond schools while allowing whites to flee to relatively white sanctuaries, the facts do not support this theory.
 
 
 23
 It is significant that of the 34,000 pupils enrolled in Henrico County schools for the school year 1970-71 only 2,035 (5.9 percent) had transferred from the Richmond city schools to the Henrico County schools during the preceding decade, and of this number 532 (26 percent) were black. Of the more than 2,500 pupils listed by the Richmond School Board as "missing" from the Richmond city schools for the 1970-71 school year, only 145 enrolled in Henrico County schools that school year, and of this number 36 (25 percent) were black.
 
 
 24
 Of the 20,676 Chesterfield children enrolled in Chesterfield County schools for the year 1970-71, only 1,335 had transferred from the Richmond city schools during the preceding 12 years. Except for 36, all were white. But, significantly, only 6.46 percent of the entire Chesterfield school population ever attended Richmond schools.
 
 
 25
 The Richmond white school population decreased from 17,203 in 1970-71 to 13,500 in 1971-72-a net loss of 3,703. But these white students did not move to Chesterfield or Henrico Counties. For both counties show a net white enrollment loss for the same period, Chesterfield down 208 white pupils and Henrico 366.
 
 
 26
 If we assume state action to keep blacks confined to Richmond, and none appears, it is evident that such action has failed to achieve its assumed invidious purpose. Richmond schools may be getting blacker, but so also are the schools of Henrico, and the trend may soon reach to Chesterfield. If the district court's conclusion was that, regardless of the effect on the schools in the City of Richmond, the counties' action kept blacks who lived in Richmond from moving to the counties, thereby perpetuating segregation in the public schools in the counties and thus denying to the plaintiffs the equal protection of the laws, we think that this conclusion is not supported by substantial evidence.
 
 
 27
 We agree that there has been some inaction, (e.g., nonparticipation in construction of low income housing) by the counties here which may have restricted the access of blacks to residences in these counties. If we assume invidious purpose, and none is established, it is possible to draw an inference of cause and effect if one ignores the possibility that in a heavily white county much of such housing would likely be occupied by low income whites. School construction site selection would seem to have little relevance to city-county movement by blacks, since, until recently, blacks who moved to the county would still have had to go to segregated schools. Thus the choice of whether to move or not would not have been influenced by the location of schools in the counties or the city. Former FHA policies and the use of racially restrictive covenants have doubtless had an impact on residential housing patterns within the city and the counties. The record does not establish whether or not Richmond's restrictive use of such tools of discrimination has been greater or less than that of the counties. We are thus unable to determine whether such discrimination, practiced in all three units, has had any impact upon movement by blacks out of the city and into the counties.
 
 
 28
 The two instances in the record of private discrimination in the sale of housing, illegal since Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), are scant evidence of state action, even assuming that state inaction in preventing such discrimination is state action within the meaning of Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).
 
 
 29
 We think that the root causes of the concentration of blacks in the inner cities of America are simply not known and that the district court could not realistically place on the counties the responsibility for the effect that inner city decay has had on the public schools of Richmond. We are convinced that what little action, if any, the counties may seem to have taken to keep blacks out is slight indeed compared to the myriad reasons, economic, political and social, for the concentration of blacks in Richmond and does not support the conclusion that it has been invidious state action which has resulted in the racial composition of the three school districts. Indeed this record warrants no other conclusion than that the forces influencing demographic patterns in New York, Chicago, Detroit, Los Angeles, Atlanta and other metropolitan areas have operated in the same way in the Richmond metropolitan area to produce the same result. Typical of all of these cities is a growing black population in the central city and a growing white population in the surrounding suburban and rural areas. Whatever the basic causes, it has not been school assignments, and school assignments cannot reverse the trend. That there has been housing discrimination in all three units is deplorable, but a school case, like a vehicle, can carry only a limited amount of baggage. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. at 24, 91 S.Ct. 1267, 28 L.Ed.2d 554.
 
 IV.
 
 30
 To approve the consolidation of these three school districts would require us to ignore the tradition and history of the Commonwealth of Virginia with respect to its establishment and operation of schools, as well as hold invalid various enactments of the Legislature of Virginia structuring Virginia's system of free public schools. In addition, there are some practical problems involving money and finance and taxes.
 
 
 31
 The power to operate, maintain and supervise public schools in Virginia is, and has always been, within the exclusive jurisdiction of the local school boards and not within the jurisdiction of the State Board of Education. County School Board of Prince Edward County v. Griffin, 204 Va. 650, 133 S.E.2d 565 (1963). Indeed, the operation of public schools has been a matter of local option. See Griffin v. School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).
 
 
 32
 Section 133 of the 1902 Constitution of Virginia provided that "the supervision of the schools in each county or city shall be vested in a school board." But school boards, per se, including a court-ordered consolidated school board, are not authorized by law to raise funds for the schools. Instead, under Virginia law, a school board is fiscally dependent upon the local governing body, e.g., county commissioners or city council, and have no authority whatever to levy taxes or appropriate funds for school purposes.
 
 
 33
 Although it is true that under Section 132 of the 1902 constitution the State Board of Education can designate two or more counties or counties and cities as a single school division, and has done so on 28 occasions, Section 133 of the constitution contemplates that even after such "consolidation" the separate school boards of the combined units are to continue to function.[7]
 
 
 34
 In 1954 the General Assembly of Virginia enacted Virginia Code 22-100.1 et seq. Under these statutes a multi-unit school district with a single school board could be established, but only by the majority vote of the school board of each affected county and/or city and with the approval of the governing body of each affected unit and the approval of the State Board of Education. Such a school division has never been established in Virginia. Prior to the order entered in this case on January 10, 1972, neither the school boards of Richmond, Henrico or Chesterfield nor any of the governing bodies of these units ever requested the State Board to take such action.[8]
 
 
 35
 Under the new Constitution of Virginia the State Board is given power to divide the Commonwealth into school divisions subject to "such criteria and conditions as the General Assembly may prescribe. At its extra session of 1971, the General Assembly enacted into law Virginia Code Sec. 22-30:
 
 
 36
 (1) No school division shall be composed of more than one county or city.
 
 
 37
 (2) No school division shall be composed of a county or city and any one of the following towns: Abingdon, Cape Charles, Colonial Beach, Fries, Poquoson, Saltville, or West Point.
 
 
 38
 Notwithstanding any of the above criteria and conditions, the Board of Education may, upon the request of the school boards of the counties, cities, and towns affected, concurred in by the governing bodies thereof, consolidate or otherwise alter school divisions.
 
 
 39
 Thus neither under the old constitution and statutes in effect prior to July 1, 1971, nor under the new constitution and statutes in effect after that date, could the State Board of Education, acting alone, have effected the consolidation of the school systems of Richmond, Henrico and Chesterfield into a single system under the control of a single school board.
 
 
 40
 But even if we were to ignore Virginia law, as we are urged to do, there are practicalities of budgeting and finance that boggle the mind. Each of the three political subdivisions involved here has a separate tax base and a separate and distinct electorate. The school board of the consolidated district would have to look to three separate governing bodies for approval and support of school budgets. The Turner Commission in its 1967 report on raising the level of public education in Virginia concluded that consolidation of school districts in Virginia could not work under Virginia's fiscal structure:
 
 
 41
 It would appear that the compulsory consolidation of School Boards, not accompanied by a consolidation of all functions of local government, would need to have a degree of fiscal independence not available under present statutes.
 
 
 42
 Apparently none of the numerous witnesses examined in the district court was aware of any instance in American education in which any expert in the field had ever recommended the consolidation of three separate school divisions into a single consolidated school division having three separate tax bases.
 
 
 43
 We think it fair to say that the only "educational" reason offered by the numerous school experts in support of consolidation was the egalitarian concept that it is good for children of diverse economic, racial and social background to associate together more than would be possible within the Richmond school district. The experts thought that the optimum size school district was one having a school population of from 20,000 to 50,000 pupils. When a district is too small, specialized programs tend to be eliminated, and when a school district is too large, it tends to become unwieldy and cumbersome and to lose parent participation.[9] Thus the consensus was that the three separate school districts were about the right size, and the consolidated district much larger than desirable for educational and administrative purposes.
 
 V.
 
 44
 By the Tenth Amendment to the Constitution of the United States it is provided that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."
 
 
 45
 One of the powers thus reserved to the states is the power to structure their internal government. "Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them. . . . The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state." Hunter v. Pittsburgh, 207 U.S. 161, 178, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907).
 
 
 46
 "When a state exercises power wholly within the domain of state interest, it is insulated from federal judicial review." Gomillion v. Lightfoot, 364 U. S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960). The Supreme Court has always recognized "the breadth and importance of this aspect of the State's political power," Gomillion, supra at 342, 81 S.Ct. at 127, but "has never acknowledged that the States have power to do as they will with municipal corporations regardless of consequences." Gomillion, supra at 344, 81 S.Ct. at 129. If the states' near plenary power over its political subdivisions "is used as an instrument for circumventing," Gomillion, supra at 347, 81 S.Ct. at 130, the Fourteenth Amendment equal protection right of blacks to attend a unitary school system, then the Tenth Amendment is brought into conflict with the Fourteenth, and it settled that the latter will prevail. Gomillion, supra. The facts of this case do not establish, however, that state establishment and maintenance of school districts coterminous with the political subdivisions of the City of Richmond and the Counties of Chesterfield and Henrico have been intended to circumvent any federally protected right. Nor is there any evidence that the consequences of such state action impairs any federally protected right, for there is no right to racial balance within even a single school district, Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. at 24, 91 S. Ct. 1267, but only a right to attend a unitary school system.
 
 
 47
 In seeking to define the extent of a district judge's remedial power in a school case,
 
 
 48
 it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters when local authority defaults.
 
 
 49
 School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.
 
 
 50
 Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).
 
 
 51
 Because we are unable to discern any constitutional violation in the establishment and maintenance of these three school districts, nor any unconstitutional consequence of such maintenance, we hold that it was not within the district judge's authority to order the consolidation of these three separate political subdivisions of the Commonwealth of Virginia. When it became "clear that state-imposed segregation . . . [had] been completely removed," Green, 391 U.S. 430, at 439, 88 S.Ct. 1689 at 1695, within the school district of the City of Richmond, as adjudged by the district court, further intervention by the district court was neither necessary nor justifiable.
 
 
 52
 As the Chief Justice said in Swann,
 
 
 53
 At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in Brown I. The systems would then be "unitary" in the sense required by our decisions in Green and Alexander.
 
 
 54
 It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. . . . in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.
 
 
 55
 Swann, 402 U.S. at 31-32, 91 S.Ct. at 1283.
 
 
 56
 In devising remedies in school cases it is difficult to know "how far a court can go, but it must be recognized that there are limits. Swann, 402 U.S. at 28, 91 S.Ct. at 1282. In Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J. 1971), aff'd mem. 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972), black plaintiffs sought to compel the joinder of separate school districts within the State of New Jersey for the purpose of achieving racial balance and preventing de facto segregation. The three-judge court held de facto segregation, defined as racial imbalance that exists through no discriminatory action of state authorities, to be beyond the ambit of the Fourteenth Amendment. On appeal the decision was affirmed without opinion by a nearly unanimous United States Supreme Court. We think Spencer v. Kugler, supra, is indistinguishable and controls decision in this case.
 
 
 57
 Because we think the last vestiges of state-imposed segregation have been wiped out in the public schools of the City of Richmond and the Counties of Henrico and Chesterfield and unitary school systems achieved, and because it is not established that the racial composition of the schools in the City of Richmond and the counties is the result of invidious state action, we conclude there is no constitutional violation and that, therefore, the district judge exceeded his power of intervention.
 
 
 58
 Reversed.
 
 APPENDIX A
 
 59
 RESOLUTIONS OF THE SCHOOL BOARD OF CHESTERFIELD COUNTY UNDER
 
 
 60
 ORDER OF U. S. DISTRICT COURT OF JANUARY 10, 1972
 
 
 61
 Be it resolved by the School Board of Chesterfield County that:
 
 
 62
 1. Whereas, on January 10, 1972, the United States District Court for the Eastern District of Virginia, Richmond Division, did enter its Final Order in the case of Bradley v. School Board of the City of Richmond, et als, in which suit this Board was joined as a defendant, and
 
 
 63
 ____
 
 
 64
 * * *
 
 
 65
 4. Whereas, it is the judgment of this Board that the best interest of the education of the children of Chesterfield County, and indeed, of the children of the City of Richmond and of Henrico County, will be promoted by maintaining Chesterfield as an independent division and system; and
 
 
 66
 5. Whereas, it is the judgment of this Board that, under no circumstances should a request under Section 22-30 be made for consolidation of the three separate divisions as required by the Order of January 10, 1972, until an agreement has been reached between the three separate political sub-divisions upon the value of the school property required to be transferred by each to the school board for the consolidated division and until payments required to equalize the value of property conveyed by each have been agreed upon among the City and the Counties based upon the value of the property conveyed by each and the anticipated school enrollment from each County and the City, and upon some other fair basis; and
 
 
 67
 6. Whereas, it is further the judgment of this Board that under no circumstances should a request be made as required by the Order of January 10, 1972, for consolidation of the separate school divisions of the Counties of Chesterfield and Henrico and the City of Richmond until the amount of the outstanding bonded indebtedness for school construction of each of the Counties and the City has been determined and agreement reached for the equitable distribution of the entire tax burden of the consolidated division among the two Counties and the City of Richmond based upon the anticipated enrollment of each in the schools of the consolidated division, or upon some other fair basis.
 
 
 68
 7. Whereas, if the members of this Board remained free to vote in accord with their independent and collective judgment and will, they would unanimously refuse to request the State Board of Education to create a single division to be composed of the Counties of Chesterfield and Henrico and the City of Richmond; and
 
 
 69
 ____
 
 
 70
 * * *
 
 
 71
 9. Whereas, our attorney aforesaid has advised us that the Order of January 10, 1972, mandatorily directs that we cast our vote in favor of a "request" that the State Board of Education create a single division composed of the Counties of Chesterfield and Henrico and the City of Richmond on or before 30 days from January 10, 1972, under pain of punishment for contempt by fine or imprisonment should we fail to do so.
 
 
 72
 10. Now, therefore, acting under the duress, coercion, and compulsion of the penalties consequent upon doing otherwise, and acting contrary to our individual and collective judgment and wills, and under the compulsion of the Order aforesaid, we do adopt and vote for the following:
 
 
 73
 11. [T]hat we request the State Board of Education to create a single school division to be composed of the Counties of Chesterfield and Henrico and the City of Richmond; this request is, however, expressly limited to such period of time, only, as said Order shall not be stayed or reversed by order of the Court of Appeals for the Fourth Circuit or of the Supreme Court of the United States. . . .
 
 WINTER, Circuit Judge (dissenting):
 
 74
 It was unfortunately predictable that a court which approved the dismantling of existing school districts so as to create smaller whiter enclaves,[1] now rejects the consolidation of school districts to make effective the mandate of Brown I and its progeny.[2] My view of this case is that the district court formulated appropriate relief and, indeed, that it decreed the only relief permissible under the fourteenth amendment. Nothing in the controlling decisions of the Supreme Court points to the contrary. I would affirm.
 
 
 75
 * The starting point in my discussion is to set forth the basic terms and provisions of the plan, which the majority condemns, and to describe how it would operate.
 
 
 76
 The City of Richmond and the surrounding counties of Henrico and Chesterfield each comprise a separate school district under existing Virginia law, although Virginia law would permit them to consolidate, provided that each consented to the consolidation.[3] The plan approved by the district court requires the consolidation of the Richmond, Henrico and Chesterfield County school districts and the establishment of a single consolidated division school board, composed of nine members with Richmond, Henrico and Chesterfield representation on a 4-3-2 basis, respectively, to administer the district. The single consolidated district would be subdivided into six geographical subdivisions, each of which, except that known as Subdivision 6, comprising the southern area of Chesterfield County which has a relatively sparse population, would have a student population varying from approximately 17,000 to 20,000. Subdivision 6 would have a student population of approximately 9,000.
 
 
 77
 The overall racial composition of the three political subdivisions in June, 1971, in aggregate, was 66.3% white and 33.7% black, and this overall racial composition differed from that of the preceding decade by only a .1% reduction in the number of white students. Each of the subdivisions would have an overall racial composition substantially similar to that of the metropolitan area as a whole. In the five subdivisions having large student populations, the racial composition would range from 62.6% to 70% white, while in Subdivision 6, the racial composition would be 81.6% white. Each subdivision would have a subdivision board to exercise closer supervision over instruction and progress of instruction and to maintain closer contacts with parents of students.
 
 
 78
 In each subdivision, the overall subdivision racial composition was used as a starting point to determine the approximate number of students of either race that should be assigned into or out of a particular school to eliminate its racial identity. Where schools had a substantially disproportionate number of either black or white students, those of the excess race would be assigned to other schools within the particular subdivision, the assignments to be determined with due consideration to the factors of proximity, distance of travel and travel time. Combinations which came closest to the average distance were selected. Except in Subdivision 6 where the sparsity of population dictated wider variance, the racial composition of the schools in the consolidated district would range between 20-40% black.
 
 
 79
 Under the plan, the great majority of students would attend a school located within the particular subdivision in which they reside. In no case would there be an exchange between noncontiguous subdivisions. Approximately 36,000 students would be exchanged between the existing Richmond system and those of the two counties, with about 1,000 more white students than black students being involved in the exchange. No exchange would take place between students in Subdivision 6 and those from Richmond, and, in Subdivision 6, three elementary schools, which are racially identifiable (one virtually all-black and two virtually all-white), would be converted into unitary schools by pairing and satellite zoning.
 
 
 80
 The students to be exchanged between existing subdivisions would be selected by a birthday lottery method, with some variance in assignment techniques where unreasonable travel times or distances might occur from use of the lottery, rather than to resort to island or satellite zoning.
 
 
 81
 Approximately 68,000 pupils are currently transported by bus within the existing three independent school districts. Under the plan approximately 78,000 pupils would be transported (from home to school, rather than from school to school as presently in Richmond)-approximately 10,000 more than at the present. The three school systems currently operate over 600 buses and a total of only 524 buses would be necessary to meet the transportation requirements under the metropolitan plan, even with school to home transportation of students who remain beyond the usual school day for extracurricular activities. The evidence shows that travel time and travel distance in each of the three presently independent school districts would not be appreciably changed when consolidation is effected.
 
 II
 
 82
 In considering the legal propriety of the decree approving and implementing the plan of consolidation under the general equitable consideration enunciated in Brown II[4] and Swann,[5] it is necessary, first, to recite the facts, historical and current, to show the context in which it was entered.
 
 
 
 * * *
 When Brown I was decided, Virginia was maintaining, and had maintained, a state-imposed dual system of schools. At approximately that time, Richmond's school population, totaling 35,857, was 56.5% white and 43.5% black; Henrico County's schools had a student population of 13,142, of which 89.6% were white and 10.4% were black; and Chesterfield County's schools had 9,432 students, of whom 79.6% were white and 20.4% were black.
 In Richmond the first feeble steps to implement Brown I were not undertaken until 1963, to become effective during the 1963-64 school year, when a freedom of choice plan was adopted. At first it was not nondiscriminately administered and judicial relief was required. See, Bradley v. School Bd. of Richmond, 317 F.2d 429 (4 Cir. 1963); Bradley v. School Board of Richmond, Virginia, 345 F.2d 310 (4 Cir. 1965), vacated and remanded 382 U.S. 103 (1965). In any event, freedom of choice did not work, and in September of 1969, no further desegregation steps having been taken, the racial composition of the Richmond system had shifted to 70.5% black and 29.5% white. On January 1, 1970, a number of Chesterfield County Schools, ranging in student enrollment from 92% to 100% white, became a part of the Richmond system, pursuant to an annexation decree,[6] and, as a result, the racial composition of the Richmond system, in September, 1970, shifted to 64.2% black and 35.8% white. But, by September, 1971, the total student population of 43,247 was 69% black and 31% white.[7]
 During the same period there was a converse racial shift in the schools of Henrico and Chesterfield Counties. By the 1970-71 school year the student population in Henrico County was 91.9% white and 8.1% black-a 2.2% increase in white and decrease in black population since Brown I was decided. Currently the white population is 91.2% and the black population is 8.8%.[8] In Chesterfield County in the 1970-71 school year the pupil population was 90.6% white and 9.4% black-an 11% increase in white and decrease in black population since Brown I was decided. Currently it is 90.9% white and 9.1% black, notwithstanding a substantial loss of white student population to Richmond because of annexation.
 Over the last decade the overall racial composition of the three divisions has varied only .1% yet, in Richmond, the racial composition has fluctuated from 57.9% white when Brown I was decided, to a current figure of approximately 70% black, while the Henrico and Chesterfield systems over the corresponding period have experienced a decrease in the overall percentages of black student enrollment. Over 85% of the black students in the combined area are contained within the Richmond system alone.
 The sordid history of Virginia's, and Richmond's, attempts to circumvent, defeat, and nullify the holding of Brown I has been recorded in the opinions of this and other courts, and need not be repeated in detail here.[9] It suffices to say that there was massive resistance and every state resource, including the services of the legal officers of the state, the services of private counsel (costing the State hundreds of thousands of dollars), the State police, and the power and prestige of the office of the Governor, was employed to defeat Brown I. In Richmond, as has been mentioned, not even freedom of choice became actually effective until 1966,[10] twelve years after the decision of Brown I. It is at once obvious that this is not a case in which there was a reasonably prompt, bona fide and sincere attempt to carry out the mandate of Brown I where, as result of benign influences, a unitary system of schools has subsequently taken on a one-sided racial identity. It is a case in which the transition to a unitary system has been delayed, as a result of state action and state inaction, until the schools on either side of artificial political subdivision boundaries, when compared one to the other, can only be said to be racially identifiable and, within the community of interest extending beyond political subdivision boundaries, constitute a dual system.
 Beyond mere delay-and the unmistakable message that the delay of the character practiced by Virginia carried to the black and to the white community, the district court found many other instances of state and private action contributing to the concentration of black citizens within Richmond and white citizens without. These were principally in the area of residential development. Racially restrictive covenants were freely employed. Racially discriminatory practices in the prospective purchase of county property by black purchasers were followed. Urban renewal, subsidized public housing and government-sponsored home mortgage insurance had been undertaken on a racially discriminatory basis. Henrico and Chesterfield Counties provided schools, roads, zoning and development approval for the rapid growth of the white population in each county at the expense of the city, without making any attempt to assure that the development that they made possible was integrated. Superimposed on the pattern of government-aided residential segregation, which the district court aptly characterized as "locking" the blacks into Richmond, had been a discriminatory policy of school construction, i. e., the selection of school construction sites in the center of racially identifiable neighborhoods manifestly to serve the educational needs of students of a single race.[11]
 The majority does not question the accuracy of these facts. I accept the findings of the district court in this regard as clearly correct. But the majority seeks to avoid their effect on the ground that evidence was lacking that the three subdivisions engaged in joint interaction to achieve the result and that "the root causes of the concentration of blacks in the inner cities of America are simply not known and . . . the district court could not realistically place on the counties the responsibility for the effect that inner city decay has had on the public schools of Richmond."
 To me, the majority's statements simply beg the issue. First, as I shall later attempt to develop, the mandate of the fourteenth amendment, as spelled out in Brown I, is directed to the State of Virginia, not simply individually to its various subdivisions. The premise of the majority's statement is that each political subdivision is free to operate in its own orbit so long as it obeys the four-teenth amendment and does not undertake to conspire with others to defeat it. I do not conceive this to be the law; whether acting singly or in concert, action and inaction, by Richmond, Henrico and Chesterfield Counties in the several regards described are all state action and it is to overall state action that the fourteenth amendment is addressed. But for present purposes, what is more important is that when Richmond, Henrico and Chesterfield Counties are finally being brought into compliance with the fourteenth amendment, we are faced with the situation where there has occurred, at least in part as a result of state action, a marked segregation of the races, in that the vast majority of black citizens are concentrated within Richmond and the vast majority of white citizens are concentrated outside of Richmond, both the "within" and "without" constituting a single unified community and constituting a portion of a single state, not so large in geographical scope that a single system of schools is not feasible and practicable without undue hardship on the combined student population.
 To decree a single system and interchange of students, notwithstanding historical political subdivision boundaries, represents no abuse of discretion under existing law. The clarion call of Brown I, Brown II, Green, Swann and Davis, that the root and branch of past deliberate operation of dual school systems be weeded out and the dual system be completely dismantled, should be too clear for misunderstanding. The scope of the problem, and of necessity the scope of the relief, is determined as of the time that the problem is met and on the facts then existing. Swann, 402 U.S. at 14, 91 S.Ct. 1267, 28 L.Ed.2d 554. The judicial response, which the Constitution requires, is the moulding of a decree to meet the necessities of the particular case. Brown II; Swann. Inherent in this concept of judicial response is that a court should exhibit all of the breadth and flexibility which the exercise of equitable jurisdiction historically has demonstrated.
 In the instant case, the dismantling of a dual system did not really begin until 1966. Then, when a fairly administered freedom-of-choice plan became operative, there had already been a substantial change in the racial ratios of the three political subdivisions, with marked black student concentration in Richmond and marked white student concentration in the suburbs. Freedom of choice was totally ineffective to accomplish the task at hand; and, while this ineffective panacea was being tried, the shift in racial concentration between city and counties became more marked. To my mind, the only effective implementation of Brown I was to do just what the district court did-to reach out beyond artificial political subdivision boundaries and to group together, into a single system, those students, or their successors, predominantly white, who had concentrated outside of Richmond during the period that Richmond and the State of Virginia abdicated completely their duty to implement Brown I. That without consolidation, it may be said that Richmond, Henrico County and Chesterfield County, viewed singly, have a unitary system is simply no answer. This record reflects no reason to respect existing political boundaries except that some of them have always existed. At the same time they have been ignored historically to perpetuate segregation, they have been altered from time to time for other political purposes, and they do not represent natural barriers. Quite clearly their preservation for school purposes is urged here only to maintain racial segregation which has occurred within the combined area. They are less than the natural barrier held not to be respected in Davis, supra n. 2, and no more than attendance zones to perpetuate segregation which we condemned in Brewer v. School Bd. of Norfolk, supra n. 11. I, therefore, can find no sufficient reason to respect them to the detriment of implementing Brown I and thus I would find no abuse of discretion in the relief formulated by the district court.[12]
 III
 Upon reflection it can only be concluded that the premise upon which the majority's opinion depends is that the operation of the fourteenth amendment is circumvented by existing boundaries of political subdivisions, assuming that these were not established in the first instance for invidious purposes. I reject this premise. The district court found, and its finding is amply supported, that Richmond and the Counties of Henrico and Chesterfield constitute a single community of interest within the State of Virginia. Increasingly over the years this has been recognized by state-sponsored study and planning groups, and justifiably so. As of 1960, over 46% of the employed residents of Chesterfield County worked in Richmond; 2.4% worked in Henrico County and 38% worked in Chesterfield County. Over 69% of the employed residents of Henrico County worked in Richmond; 3.7% worked in Chesterfield County and 22.4% worked in Henrico County. More than 3% of the employed residents of Richmond worked in Chesterfield County and 2.6% worked in Henrico County. Later figures are incomplete; but in 1970-71 only 45% of the employed residents of Henrico County worked in Richmond, the diminution since 1960 undoubtedly attributable to the growth of industrial development in Henrico County. Currently about 48% of the employed residents of Chesterfield County work in Richmond, notwith-standing the recent annexation.
 In addition to employment, there are many ties which bind the three subdivisions into a single community of interest. Of eighteen hospitals in the combined area, seventeen are located in Richmond and one in Henrico County. The main libraries, museums and institutions of higher learning are in Richmond. Prior to school consolidation as decreed, the three subdivisions have shared special educational facilities. The indices of retail sales, commuter traffic patterns and interjurisdictional utility services, and, as stated, recreational, educational, cultural, transportation and health care facilities, show that Richmond is the essential economic element in the region, as well as the major place of employment, the center of commerce, industry and retail sales, and the state capitol.[13]
 Of course, the fourteenth amendment does not apply to prohibit discriminatory treatment between the states; by its terms it is addressed only to each state, as a single entity, and not to the states collectively.[14] But it most certainly does not depend in its operation on how a state may have elected to subdivide itself into subdivisions. Although a state may create cities, counties, townships and school districts, the exercise of government by these units is state action and the guarantee of the fourteenth amendment that there be equal protection of the laws is fully applicable.[15] If the equal protection clause prohibits a state from varying its laws within its borders or among its inhabitants, absent a sound reason for such a discriminatory treatment, I cannot see how its obligation to dismantle a dual system of schools should be limited by the political subdivision boundaries here, accepting as I do the finding that the three political subdivisions here constitute but a single area of interest. The fact of separate political subdivisions, as such, has never been heretofore thought to be a proper basis for unequal treatment; Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), are authority for the proposition. Indeed, Brown II, 349 U.S. at 300-301, 75 S.Ct. 753, and Swann, 402 U.S. at 27, 91 S.Ct. 1267, both strongly suggest that a permissible tool to implement Brown I is to revise school district boundaries. How then, in an area which constitutes a single community of interest, can schools racially identifiable as black be permitted to exist a short distance within the boundary of Richmond and schools racially identifiable as white be permitted to exist a short distance without? To me, this result is manifest frustration of the teaching of Brown I.
 Of course, I do not suggest that the equal protection clause requires that there be an homogeneous racial mixture in all of the schools throughout the State of Virginia. Unquestionably, there comes a point when a school district becomes too large geographically, is too cumbersome administratively, and encompasses so many pupils that to eliminate racially identifiable schools within the district, transportation of pupils would be required to be undertaken in such magnitude of numbers and cost that unreasonable hardships would result. The direction to create such a district would be invalid, but the consolidated school district ordered here is not of that category. Although large, the consolidated district will not be unworkable.[16] It will be administratively feasible within the state law which existed at the time that the current phase of this tortuous litigation began and until, legislatively, an effort was made to defeat the relief which was indicated. It will be administratively feasible also under existing law, except that the requirement of existing law that the consent of those consolidated will not be met. Fewer buses will be needed to transport pupils than presently are employed. There will not be an unexceptionable increase in the number of pupils to be transported or in the time and distance of transportation.
 Therefore, as I view the application of the fourteenth amendment, Brown I requires consolidation in this case. While discreetly exercised, the equitable jurisdiction of the district court was used to do no more than the Constitution directs.
 IV
 Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J.1971), aff'd. 404 U.S. 1027, 92 S. Ct. 707, 30 L.Ed.2d 723 (1972), is not, I submit, indistinguishable from or controlling of the instant case as the majority concludes. In Spencer the alleged cause of action was racial imbalance between school districts in a state which had no history of a state-imposed dual system of education, where there was no allegation that the school district boundaries had been invidiously drawn and where there was no allegation that state action caused or contributed to the racial imbalance. In Spencer the essence of the complaint was that there should be racial balancing, for its own sake-the very principle condemned in Swann, 402 U.S. at 22-25, 91 S.Ct. 1267.
 This case is different. Virginia has a history of a state-required dual system of schools. Consolidation of school districts has been ordered, not to achieve racial balance as such, but to weed out the effects of past discriminatory practices, especially as they were permitted to proliferate by long-deferred compliance with Brown I. Of course, in formulating relief, the district court gave consideration to racial ratios. But it did no more than what is permitted by Swann i.e., used them as "a starting point in the process of shaping a remedy, rather than an inflexible requirement," because "[a]wareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations." 402 U.S. at 25, 91 S.Ct. at 1280. The range of racial ratios among the various subdivisions of the consolidated district, particularly Subdivision 6 compared to the other subdivisions, and among the various schools within the several subdivisions is sufficient proof that the district court did not abuse its remedial equitable discretion.
 Finding no bar in Spencer, I would, for the reasons expressed, affirm.
 
 
 [1]
 The history of this litigation unfolds in Bradley v. School Board of the City of Richmond, 317 F.2d 429 (4th Cir. 1963); 345 F.2d 310 (4th Cir. 1965), rev'd and remanded, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). After four years under a consent decree, the subsequent litigation in the district court is found in Bradley v. School Board of the City of Richmond, 51 F.R.D. 139 (E.D.Va.1970); 317 F.Supp. 555 (E.D.Va.1970); 324 F. Supp. 396 (E.D.Va.1971); 324 F.Supp. 439 (E.D.Va.1971); 324 F.Supp. 456 (E. D.Va.1971); and 325 F.Supp. 828 (E.D. Va.1971). The opinion of the district court which is the subject of this appeal is Bradley v. School Board of the City of Richmond, D.C., 338 F.Supp. 67, (E.D. Va.1972), hereinafter referred to as Bradley
 
 
 [2]
 This is not a bussing case. That remedy, approved in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), has been utilized in Richmond and is not challenged on appeal
 
 
 [3]
 "The term 'viable racial mix' was defined by Dr. Little as 'It is a racial mix that is well enough established that it will continue to prosper. It will be a desirable, reasonable mix for educational purposes. . . ."' Bradley, at 186, n. 22
 
 
 [4]
 In apparently adopting Dr. Pettigrew's viable racial mix theory, the district court rejected the testimony of another expert that the idea of a viable racial mix in which blacks must be in the minority in order to have a good education is a racist proposal. Dr. Hooker thought that the consolidation of schools in the Richmond area would "disenfranchise" black residents by preventing them from achieving control of the school system and would in time be resented by black citizens as paternalistic and patronizing. The position of one of the amici, the Congress of Racial Equality, is similar to that expressed by Dr. Hooker
 
 
 [5]
 The author of this opinion is not unsympathetic with the district judge's having accepted the Pettigrew theory of "viable racial mix." In Brunson v. Board of Trustees of School District No. 1 of Clarendon County, South Carolina, 429 F.2d 820 (1970), I wrote favorably of such an approach because of my dismay that white fleeing had actually occurred and would unquestionably continue until there were neither black schools nor white schools, but just black schools only. But in that case there was an extreme preponderance of blacks not present in the Richmond school district. Even so, I acknowledge doubt about my approach in that case and an increasing respect for the viewpoint of Judges Sobeloff and Winter expressed in opposition. Brunson, supra at 823
 
 
 [6]
 The district court's concern with viable racial mix has been partly alleviated by this annexation, which has now been approved by this court. Holt v. City of Richmond, 459 F.2d 1093 (4th Cir. 1972)
 
 
 [7]
 "There shall be appointed by the school board or boards of each school division, one division superintendent of schools . . . ." Constitution of Virginia Sec. 133 (1902)
 
 
 [8]
 Under coercion of the district court, the School Board of Chesterfield County, on February 5, 1972, adopted a resolution set out in part as Appendix A
 
 
 [9]
 Dr. Thomas C. Little, expert witness for plaintiff and associate superintendent of the Richmond schools, conceded that:
 You also reach a point, and I don't know exactly what that point is, some 50, 60, 70 thousand students, whereby it becomes unwieldy for certain types of operations, particularly your curriculum, your involvement and neighborhood input into the operation of your schools.
 
 
 [1]
 United States v. Scotland Neck City Board of Education, 442 F.2d 575 (4 Cir. 1971), cert. granted 404 U.S. 821, 92 S.Ct. 47, 30 L.Ed.2d 49 (1971); Wright v. Council of the City of Emporia, 442 F.2d 570 (4 Cir. 1971), cert. granted 404 U.S. 820, 92 S.Ct. 56, 30 L.Ed.2d 48 (1971). A decision of the Supreme Court in these two cases may be announced this term. While the district court attemped to distinguish these cases, the fact is that they are simply the obverse of the same coin which is presented here. In each of Scotland Neck and Emporia, the effect of splitting the school district was further to delay and hinder the achievement of what would otherwise have been a unitary system in the original district, although arguably there were noninvidious reasons for subdividing. Here, as I view the case, the question is one of consolidating school districts within the framework of state law in order to eradicate the effects of past discrimination and to achieve a unitary system. Logically it is impossible to sustain the former and not condemn the converse. Were the case as simple as described in the opening paragraph of the majority opinion, I doubt that I would dissent
 
 
 [2]
 Brown I and the principal subsequent decisions are: Brown v. Board of Education (Brown I), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown v. Board of Education (Brown II), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Green v. County School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. Board of School Comm'rs. of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971)
 
 
 [3]
 Prior to July 1, 1971, and at the time when plaintiffs first sought the relief which was ultimately granted, the Virginia State Board of Education had the duty to establish appropriate school divisions and the power to create a division encompassing more than one political subdivision. In the latter regard, there was no requirement of local consent. Va.Const. Sec. 132, as amended (1902); Va.Code Ann. Secs. 22-30, 22-100.1 (Repl. Vol.1969). Such a division would be administered by a superintendent elected jointly by the school boards of the political subdivisions comprising the single school division. Va.Const. Sec. 133, as amended (1902); Va.Code Ann. Sec. 22-34 (Repl.Vol.1969). Alternatively, with the consent of the State Board of Education, the school boards and governing bodies of the affected political subdivisions, the local school boards could be abolished and a single division school board created. Va.Const. Sec. 133, as amended (1902); Va.Code Ann. Secs. 22-100.1 and 22-100.2 (Repl.Vol.1969)
 The Virginia Constitution was revised in 1970, the revisions becoming effective July 1, 1971. A consolidation of school districts of political subdivisions may now be effected only at the request (and with the consent) of the school boards and governing bodies of the affected political subdivisions. Va.Const. Art. VIII, Sec. 5(a), as revised (1970); Va. Code Ann. Sec. 22-30 (Cum.Supp.1971). With the exception of this present requirement of consent, it is correct to say that under Virginia statutes enacted pursuant to both the former and the current State Constitutions, there were and are specific provisions governing (1) the composition, appointment and terms of members of a school board of a division composed of two or more political subdivisions, (2) the qualifications and duties of the consolidated division board members, (3) the corporate status of such a board and its general powers. (4) the compensation of board members, (5) the transfer of title to school property, (6) the State Board's responsibility for promulgating rules and regulations for the financial plan of operation of the schools of the consolidated division, (7) the formula for the allocation of operating costs, capital outlay, and incurring of indebtedness for school construction, (8) the fiscal agent for the consolidated division, and (9) the effective date for formation of the Board and its assumption of the supervision and operation of all schools within the consolidated division. Va.Code Ann. Secs. 22-100.3 to 22-100.11 (Cum.Supp.1971). It may be added that in all respects the order of the district court complied with the provisions of existing state law, save only that of the requirement of consent of the school boards and governing bodies of all of the affected political subdivisions.
 
 
 [4]
 Brown II, 349 U.S. at 300, 75 S.Ct. at 756:
 In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them. (footnotes eliminated)
 
 
 [5]
 Swann, 402 U.S. at 15-16, 91 S.Ct. at 1276:
 Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.
 [A] school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution.
 
 
 [6]
 Holt v. City of Richmond, 459 F.2d 1093 (4 Cir. 1972)
 
 
 [7]
 On August 17, 1970, the district court approved an "Interim Plan" for the operation of Richmond's schools for the 1970-71 school year. Bradley v. School Bd. of City of Richmond, 317 F.Supp. 555, (E.D.Va.1970), 324 F.Supp. 456 (E.D. Va.1971). On April 5, 1971, the district court ordered the implementation of another plan, "Plan III," for the school year 1971-72. Bradley v. School Board of City of Richmond, 325 F.Supp. 828 (E.D.Va.1971). Following the implementation of the Interim Plan, Richmond lost 3,250, or 16% of its projected white student enrollment. This loss was more than three times the normal rate of attrition of white students
 With respect to Plan III, the majority stresses that the district court found that implementation would accomplish a unitary system in the City of Richmond. I would stress that the district court made this finding only on the express assumption that the city would operate as a single administrative unit for school purposes. Of course, that same assumption underlay Judge Sobeloff's dissent in Brunson v. Board of Tr. of Sch. D. No. 1 of Clarendon Co., S.C., 429 F.2d 820, 823-827 (4 Cir. 1970), in which I joined and which the author of the majority opinion in the instant case belatedly finds persuasive.
 
 
 [8]
 While the percentage of black population in Henrico County for the 1970-71 school year was less than it was when Brown I was decided, the 1970-71 figure of 8.8% did represent an increase over 1960-61 when the figure was 6.67%
 
 
 [9]
 See, in particular, Bradley v. School Bd. of City of Richmond, 317 F.2d 429 (4 Cir. 1963); Bradley v. School Bd. of City of Richmond, 345 F.2d 310 (4 Cir. 1965), vacated and remanded 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). See also, the opinion of the district court in the instant case, 338 F.Supp. 67 (E.D.Va. 1972), and James v. Almond, 170 F.Supp. 331 (E.D.Va.1959), appeal dismissed 359 U.S. 1006, 79 S.Ct. 1146, 3 L.Ed.2d 987 (1959); Adkins v. School Bd. of New-port News, 148 F.Supp. 430 (E.D.Va.), aff'd. 246 F.2d 325 (4 Cir.), cert. denied, 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63 (1957)
 
 
 [10]
 The relief granted by the district court in Bradley v. School Bd. of Richmond, 317 F.2d 429 (4 Cir. 1963), was only to order the admission of individual black plaintiffs to formerly all-white schools; an injunction running to the benefit of the entire class was denied. We reversed on the latter point. In the next appeal, Bradley v. School Bd. of City of Richmond, 345 F.2d 310 (4 Cir. 1965), we rejected a challenge to the freedom of choice desegregation plan and also held that faculty desegregation would not be required. On the latter point, the Supreme Court reversed. 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). Finally, in March, 1966, a consent decree embodying freedom-of-choice and faculty desegregation was entered
 
 
 [11]
 Even before the decision in Swann, we held in Brewer v. School Bd. of Norfolk, 397 F.2d 37 (4 Cir. 1968), that the obligation of state authorities to create a unitary system was not met by the adoption of attendance plans which merely reproduced segregated housing patterns in the schools. No less may school construction sites be selected to serve only racially identifiable neighborhoods
 
 
 [12]
 Maryland Committee etc. v. Tawes, 377 U.S. 656, 675, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964), and Lucas v. Forty-fourth General Assembly of Colorado, 377 U.S. 713, 738, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964), go far to establish that where the equal protection clause is at issue history and tradition will not save existing political and subdivision boundaries
 
 
 [13]
 The amicus brief of American Civil Liberties Union and American Civil Liberties Union of Virginia convincingly describes the evaluation of the cultural and economic ties in the combined area of Richmond, Henrico and Chesterfield Counties through the eyes of their school population when it states:
 Given the factual context of this case, a child attending any Metropolitan Richmond school knows whether his school is a white one or a black one. He probably lives within a half hour of the center of the city. Either his parents or his neighbor's parents work within the city limits. No matter where he lives in the metropolitan area, the child will go to the hospital in the center of the city if he is ill, and his parents are likely to go into the city center for entertainment. There are no definite natural geographical boundary lines which divide up the city, and the political lines constantly shift with each new annexation. The only clear physical demarcation between various parts of the metropolitan area is that people living near the center of the city are predominantly black and people living further away are predominantly white; or, to put it in terms of the child's perspective-people living near the center attend "black" schools, and people living further away attend "white" schools.
 14 U.S.Constitution, Art. 14, Sec. 1:
 No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. (emphasis added) See, Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254 (1921); Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883).
 
 
 [15]
 Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 reh. denied, 321 U.S. 804, 64 S.Ct. 778, 88 L.Ed. 1090 (1944). See also, United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966)
 
 
 [16]
 The consolidated district ordered by the district court would encompass 752 square miles and 104,000 pupils. Virginia has six other existing school districts encompassing more than 700 square miles (Bedford, Pittsylvania County, Albemarle County, Halifax, Rockingham County and Augusta County.) Fairfax County School District presently enrolls 135,948 students
 It is significant also that since 1944 it has been the policy of the Virginia State Board of Education to encourage the consolidation of school districts. Then, it was proposed to create 50-60 school districts to replace the existing 110 divisions. This policy was abandoned, effective July 1, 1971, when the State Board of Education required deconsolidation of all school divisions comprising more than one political subdivision. Such action was taken pursuant to legislative direction enacted while the present phase of the instant case was pending before the district court.