Brenda EVANS et al., Plaintiffs,

v.

Madeline BUCHANAN et al.,
Defendants.

Civ. A. Nos. 1816–1822.

United States District Court,
D. Delaware.

March 27, 1975.

Louis L. Redding, Irving Morris, and Joseph A. Rosenthal, Morris & Rosenthal, Wilmington, Del., for individual plaintiffs.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Frederick H. Altergott, Asst. City Sol., Wilmington, Del., for intervening plaintiffs, The Bd. of Ed. of the City of Wilmington.

William Prickett, and Mason E. Turner, Jr., Prickett, Ward, Burt & Sanders, Wilmington, Del., and Philip B. Kurland, Chicago, Ill., for defendants.

John P. Sinclair, Potter, Anderson & Corroon, Thomas S. Lodge, Connolly, Bove & Lodge, Edward W. Cooch, Jr., Cooch & Taylor, and Samuel R. Russell, Wilson & Russell, Wilmington, Del., for intervening defendants.

John S. Grady, Bader, Dorsey & Kreshtool, Wilmington, Del., as amicus curiae.

Before GIBBONS, Circuit Judge, and WRIGHT and LAYTON, Senior District Judges.

OPINION

CALEB M. WRIGHT, Senior District Judge.

The issue before the Court is whether, in light of the Supreme Court's opinion in Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (July 25, 1974), it is incumbent upon us to consider metropolitan as well as Wilmington-only school desegregation remedies. Based on the findings we make today, we conclude that the record in this case makes it necessary to consider inter-district school desegregation remedies. Accordingly, the parties will be required to submit alternative Wilmington-only and inter-district plans to eliminate existing school segregation in New Castle County.

I

This lawsuit began in 1957. Its object was to eliminate the *de jure* segregation in Delaware schools. The history of the case is set forth in detail in our most recent opinion, Evans v. Buchanan, 379 F.Supp. 1218 (D.Del.1974). In that opinion, filed on July 12, 1974, we found unanimously that many schools in Wilmington which were black schools prior to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*) remained identifiably black until 1974, and that the dual school system in Wilmington had not been eliminated. We also re-affirmed repeated holdings by this Court and the Court of Appeals that the duty to desegregate Delaware schools rests primarily with the State Board of Education. 379 F. Supp. at 1221–22. The majority of the Court postponed consideration (a) of plaintiffs' challenge to the constitutionality of the Educational Advancement Act of 1968, 14 Del.C. § 1001 et seq. and (b) of plaintiffs' claim that state enforcement and authorization of private racial discrimination, particularly

in housing, resulted in racially segregated schools in New Castle County. Our brother Gibbons, would have found, on the authority of Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), and United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S. Ct. 2214, 33 L.Ed.2d 75 (1972), that the provisions of the Educational Advancement Act excluding the Wilmington School District from a general reorganization of Delaware school districts were unconstitutional.

The majority of the Court could not, without making further findings, determine whether or not a remedy confined to the Wilmington School District would satisfy existing constitutional requirements. Therefore, the parties were required to submit, by September 15, 1974, alternative desegregation plans (a) within the present boundaries of the Wilmington School District and (b) incorporating other areas of New Castle County. 379 F.Supp. at 1224.

Before the date for submission of desegregation plans, the Supreme Court issued its *Milliken* opinion. That decision raised issues which led us to postpone the submission of desegregation plans. Both Chief Justice Burger's opinion for the Court and Justice Stewart's concurring opinion commented upon the limited opportunity afforded to suburban Detroit school districts to present evidence in *Milliken*. 418 U.S. at 754, 94 S.Ct. 3112. We therefore deemed it appropriate to afford suburban New Castle County school districts an opportunity to intervene in this proceeding pursuant to Rule 24, Federal Rules of Civil Procedure, and to present evidence on issues raised by the amended complaint. Appropriate notice was given to all districts which might be affected by a decree, and virtually all suburban school districts intervened.[1] All of the inter-

---

1. The intervening districts are: Alexis I. DuPont, Alfred I. DuPont, Appoquinimink, Claymont, Conrad, DeLaWarr, Marshallton-

McKean, Mount Pleasant, New Castle-Gunning Bedford, Newark and Stanton. Only the New Castle County Vocational-Technical

vening districts elected to adopt the State Board's pleadings and to stand on the evidence already of record in this proceeding. A brief schedule was established among all parties for argument on the impact of the *Milliken* opinion on the scope of this Court's remedial authority. Briefing was completed and oral argument held on January 15, 1975.

## II

In Milliken v. Bradley, the Supreme Court framed an equitable limitation on the appropriate remedies for *de jure* school segregation. The essence of the holding in *Milliken* is found in three sentences:

> The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. Swann [v. Charlotte-Mecklenburg Board of Education], 402 U.S. [1], at 16, [91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554 (1971)]. Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of inter-district segregation. 418 U. S. at 744, 94 S.Ct. at 3127.

District did not choose to intervene. That district presently accepts students from throughout New Castle County.

2. In the late 1950's the Carver School District, a black suburban district, arranged to have its black high school students sent to a predominantly black high school in Detroit, rather than to geographically closer white suburban or city schools. 418 U.S. at 749, 94 S.Ct. 3112. Cf., Bradley v. Milliken, 484 F.2d 215, 231 (6th Cir. 1973). Even though this practice terminated in 1960 when the

The Supreme Court found that in Detroit, acts of *de jure* segregation were, with one exception held to be *de minimis*,[2] confined to the limits of the Detroit School District. Even though the State of Michigan, as well as the Detroit school authorities, was responsible for this *de jure* segregation, a cross-district remedy was found to be improper, in light of the fact that historically Michigan school districts were meaningfully separate and autonomous, that the district boundaries were not established for the purpose of creating, maintaining, or perpetuating segregation of races, and that unitary school systems have long been required by Michigan law.

We do not read the *Milliken* decision as restricting the reach of the fourteenth amendment. It is true that Chief Justice Burger writes at one point:

> Where the schools of only one district have been affected, there is no *constitutional power* in the courts to decree relief balancing the racial composition of that district's schools with those of the surrounding districts. At 749, 94 S.Ct. at 3129 [emphasis added].

An expansive interpretation of this language would suggest an immunity from constitutional scrutiny, by the federal courts or Congress, for state decisions concerning political or administrative subdivisions. Other language in the opinion however, demonstrates that such an interpretation of the quoted language is improper. The opinion states:

> Of course, no state law is above the Constitution. School district lines and

Carver District was annexed by a predominantly white suburban district, the Supreme Court stated, " . . . it appears that this situation, whether with or without the State's consent, may have had a segregatory effect on the school populations of the two districts involved." 418 U.S. at 750, 94 S. Ct. at 3130. However, the Supreme Court found that this "isolated instance" of inter-district segregation did not justify a remedy of the scope contemplated by the lower courts. *Ibid.*

**432**

the present laws with respect to local control, are not sacrosanct and if they conflict with the Fourteenth Amendment federal courts have a duty to proscribe appropriate remedies. At 744, 94 S.Ct. at 3127.[3]

Both the factual context and the language of the majority opinion indicate that it is concerned with the appropriate exercise of federal equity jurisdiction, not the questions of substantive constitutional law. See generally, The Supreme Court, 1973 Term, 88 Harv.L.Rev. 41, 59–69 (1974). Such was clearly the understanding of Justice Stewart, at 753, 94 S.Ct. 3112, and such has been the consistent interpretation of lower court decisions following *Milliken*. See, e. g., Newburg Area Council, Inc. v. Board of Education of Jefferson County, Kentucky, 510 F.2d 1358 (6th Cir., 1974); Gautreaux v. Chicago Housing Authority, 503 F.2d 930 (7th Cir. 1974); United States v. State of Missouri, 388 F. Supp. 1058 (E.D.Mo.1975).

 Michigan, unlike Delaware, never required segregation by race in its schools. We conclude, however, that the remedial standards adopted by *Milliken* are equally applicable to formerly *de jure* states. Nothing in the Supreme Court's opinion suggests that it does not govern desegregation decrees in states which formerly required segregation by law. Compare, Newburg Area Council, Inc. v. Board of Education of Jefferson County, Kentucky, *supra*. Of course, to the extent that segregation imposed by state law has had inter-district effects, federal courts can fashion appropriate inter-district remedies. In short, this Court, in light of the *Milliken* holding, is authorized to consider desegregation relief embracing more than the Wilmington district only upon findings either that school districts in New Castle County are not meaningfully separate and autonomous, or that there have been racially discriminatory acts of the state or of local school districts causing inter-district segregation. Because our opinion of July 12, 1974, made no findings concerning inter-district constitutional violations, we must now make additional findings on these issues.

### III

New Castle County, the most populous of Delaware's three counties, occupies 435 square miles in area and has a population, according to the 1970 census, of approximately 386,000.[4] The City of Wilmington occupies approximately 15 square miles and is located roughly at the center of that portion of New Castle County which lies north of the Chesapeake and Delaware Canal. In 1970, Wilmington's population was approximately 80,000. According to the 1970 census, 12.7% of New Castle County residents are black, and while 43.6% of Wilmington residents are black, only 4.5% of suburban New Castle County residents are black. During the past two decades, New Castle County has experienced rapid demographic change, consisting of substantial growth in the population of the suburbs and white flight from the City of Wilmington. In 1950, the City of Wilmington had a population of about 110,000, of whom 15% were black. At the same time, suburban New Castle County had a population of about 62,000, of whom 6.4% were black. Since 1950, in other words, the suburban population has increased fivefold and the percentage of black residents living in the suburbs has declined slightly. Wilmington's population, on the other hand, decreased in absolute terms, and its proportionate black population tripled. The result of these demographic changes is

3. The majority opinion also states, "Boundary lines may be bridged where there has been a constitutional violation calling for inter-district relief . . . ." at 741, 94 S.Ct. at 3125.

4. In 1970, the population of Delaware was approximately 548,000.

that the black population of the County is heavily concentrated within the City of Wilmington.[5]

The residential demographic change of the past two decades has had a striking effect on the school attendance patterns in the County. Of the 21,543 children attending suburban New Castle County schools in 1954, only 845, or approximately 4% were black. Wilmington school enrollment in 1954 was 12,875, of whom 3,572, or approximately 28% were black. PX 134(e). By 1964, suburban New Castle County schools enrolled 52,723 students, of whom 3,325, or about 6% were black, DX 129, while Wilmington enrollment was 15,527, of whom 8,868 students, or 57% were black. PX 6. In 1973, suburban enrollment was 73,008, including 4,359, or 6% black children. In that year, Wilmington enrollment was 14,688, which included 12,141, or approximately 83% black students. PX 5. In sum, during this period of rapid expansion of suburban school enrollment, the proportion of black children attending suburban New Castle County schools remained relatively small. Total enrollment in Wilmington, on the other hand, grew more slowly and eventually declined, but the proportion of black children in the school population increased threefold.

Many of the school districts in New Castle County have historic antecedents.[6] However, during the period before *Brown I,* there was substantial interdependence of the Wilmington and suburban school systems. For many years, the only high school in the County that accepted black students was Howard High School in Wilmington. Many black students traveled across district lines to attend Howard. Moreover, black elementary and junior high school students from suburban areas often attended Wilmington "colored" schools rather than the "colored" schools nearer their homes. In the 1954–55 school year, Howard High School received 101 black high school students, Bancroft Junior High School received 46 black junior high school students, and Elbert, Stubbs, and No. 20 Elementary Schools received 44 black elementary students from suburban New Castle County districts.[7] PX 157. Although 845 black children attended suburban "colored" schools that year, the number of black children crossing district lines into Wilmington indicates that to a significant extent, black schools in Wilmington under the *de jure* system were schools for black children from throughout New Castle County. Sometime after *Brown I,* this inter-district transfer program ceased, and black children attended school in the suburban districts where they resided. As we found in our recent opinion, however, Howard, Bancroft, Elbert and Stubbs remain identifiably black schools today.

At the same time that suburban black children attended Wilmington's "colored" schools, suburban white children crossed district lines to attend "white" schools in Wilmington, either because their home districts lacked a full twelve-grade program or because Wilmington schools were considered educationally superior. In the 1954–55 school year, 910 white non-resident students attended Wilmington schools. These students came from virtually all suburban districts, and in particular, substantial numbers of students came from the Alexis I. DuPont, Alfred I. DuPont, Claymont, Conrad, Mount Pleasant, and New Castle Districts. PX 157. As the suburban districts built new schools and ex-

---

5. See generally, PX 1–4, 18; Pre-trial Order.

6. Many of the suburban districts originated, in whole or in part, in the late 19th or early 20th century. However, almost every present suburban school district has been involved in district consolidation or sharing of facilities with neighboring districts. T. 2108–11, 2485–2503.

7. According to PX 157, these black children resided in the following districts: Alexis I. DuPont, Conrad, Delaware City, Hockessin, Millside, Newark, and New Castle.

panded existing facilities to accommodate increasing student populations in the years following *Brown I*, surburban white children were no longer sent to Wilmington schools and attended schools in their suburban districts.[8]

Nearly all of the Wilmington schools which were segregated white schools before *Brown I* have since become predominantly black schools.[9] The growth of identifiably black schools mirrored population shifts in New Castle County. To a significant extent these demographic changes, i.e., the net outmigration of white population and increase of city black population in the last two decades, resulted not exclusively from individual residential choice and economics, but also from assistance, encouragement, and authorization by governmental policies. Here, as elsewhere, the 1936 Federal Housing Administration mortgage underwriting manual, which continued in use until 1949, advocated racially and economically homogeneous neighborhoods.[10] Prior to passage of federal and state open housing legislation in 1968, Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq.; Equal Rights to Housing Act, 6 Del.C. § 4601 et seq., racial discrimination in the sale or rental of private housing in New Castle County was widespread, was tolerated or encouraged by the real estate industry, and was sanctioned by state officials. Racially restrictive covenants, held to violate the fourteenth amendment in Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), continued to be recorded in New Castle County real estate deeds until 1973. PX 206. The Delaware Real Estate Commission, a state licensing agency, published *The Real Estate License Act and Primer* which reprinted the Code of Ethics of the National Association of Real Estate Boards. That Code of Ethics read in part:

> A realtor should never be instrumental in introducing into a neighborhood a character of property or occupancy, members of any race or nationality, or any individuals whose presence will clearly be detrimental to property values in that neighborhood. PX 142.

This language making racial discrimination a matter of realtor ethics was not

---

8. See T. 1114–17; PX 95. Evidently, suburban children continued to attend Brown Vocational School in Wilmington until the late 1960's, when the New Castle County Vocational-Technical School opened and began accepting students from throughout the County. PX 6; T. 2526–34.

The "withdrawal" of suburban children, both black and white, from the Wilmington School District may have altered the racial balance of school attendance in Wilmington somewhat. Not including Brown Vocational School students, 916 (black and white) students from suburban New Castle County, approximately 21% of whom were black, attended (*de jure*) Wilmington schools in the 1954–55 school year. PX 157. Assuming these children were "withdrawn" from Wilmington during the 1950's, when the Wilmington schools ranged from 28% (1954) to 45% (1960) black, the withdrawal reduced, to an extent, the proportionate white enrollment. We do not find this "withdrawal" of students to be significant inter-district segregation under *Milliken*.

9. The Highlands Elementary School is the only pre-*Brown* white school still having a predominantly white enrollment. Cedar Hill School, which opened in 1959, is the only other public school in Wilmington with a majority white enrollment. PX 6.

10. PX 176. President Nixon, in a message to Congress of June 29, 1971, recognized the continuing effect of federal policies sanctioning residential segregation:

Residential separation of racial minorities was, and is, another characteristic of the social environment which has been influenced by federal housing policy. Until 1949, FHA officially sanctioned and perpetuated community patterns of residential separation based on race by refusing to insure mortgages in neighborhood[s] not racially homogeneous. The effects of this policy have persisted for many years after its reversal and are still evident in metropolitan areas today. H.R.No. 92–136 (June 29, 1971).

See also, Bradley v. Milliken, 418 U.S. at 725, n. 7, 94 S.Ct. 3112; Oliver v. Kalamazoo Board of Education, 368 F.Supp. 143, 182 (W.D.Mich.1973).

eliminated in the state publication until 1970.[11] The pervasiveness of housing discrimination in the New Castle County real estate industry is demonstrated by the Multi-List established by the Greater Wilmington Board of Realtors in April, 1965. The Multi-List designated as "open" those listings where the owner was willing to sell to a minority buyer. A study of the Multi-List during the period 1965–67 prepared by the State Human Relations Commission indicated that 51% of all new listings in the City of Wilmington were "open", but only 7% of new listings in the suburbs were "open". PX 179.

Public housing policies also contributed to the concentration of minority residents in Wilmington. Until 1972, the Wilmington Housing Authority had jurisdiction to establish publicly-assisted housing units up to five miles beyond the city limits. Nevertheless, while the Wilmington Housing Authority operates over 2,000 public housing units within the City of Wilmington, fewer than 40 units were established in the suburbs. The New Castle County Housing Authority, which was created in January 1972, failed, until the time of trial, to build any housing units in the suburbs and operated a minimal number of pre-existing units located on the property of the Greater Wilmington Airport. The several attempts by the County Housing Authority to fund public housing developments at suburban sites have met vigorous opposition from neighborhood groups and have been unsuccessful in gaining the necessary rezoning or site approval from the New Castle County Council.[12] Undoubtedly, there are many legitimate objections to public housing developments, but the fact remains that during a period of extraordinary population growth in New Castle County, virtually the only public housing units constructed were located in the City of Wilmington. The evident effect was to concentrate poor and minority families in Wilmington. [13]

Moreover, certai npolicies of the Wilmington School Board, although possibly designed to minimize the flight of white families with school-aged children to the suburbs, may have had the opposite effect. The record indicates that optional attendance zones established by the Wilmington School Board after 1954 in several instances allowed white students to attend schools in attendance areas other than those in which they resided.[14] One result of these optional attendance zones was to create a proportionately larger

11. T. 509–12, 543–44, 2437.

12. T. 860–936; PX 173.

13. The cities of Newark and Middletown also operate public housing programs. Presumably these are small programs, but the record does not indicate the number of units and racial composition of residents in these two programs. The record is also silent as to the racial population of present residents of publicly-assisted housing in Wilmington and the suburbs. According to the 1970 census, however, the proportion of all families with incomes below the poverty level is approximately three times greater for blacks than whites in Wilmington and approximately five times greater for blacks than whites in suburban New Castle County. PX 18, Tables P–4, P–6. Thus, it is unlikely that if publicly-assisted housing were built in the suburbs, the units would be occupied primarily by low-income whites. Compare, Bradley v. School Board of City of Richmond, Virginia, 462 F.2d 1058, 1066 (4th Cir. 1972).

14. Examples of such optional attendance zones, according to Dr. Gordon Foster, plaintiffs' expert witness, were the Cedar Hill-Lore and Highlands-Lore elementary schools, the Warner-Bancroft and Bayard-Bancroft options for junior high schools, and the Howard-P.S. DuPont options for high schools. T. 1358–1428. The drawing of the attendance zone for the Cedar Hill Elementary School, built in 1959 to replace the old No. 19 School which had a predominantly white enrollment, also had a segregative effect. The Cedar Hill boundaries were extended several blocks north of the No. 19 attendance area to include an all-white residential area formerly belonging to the Williams School attendance area. The Cedar Hill School opened with a 3.3% black enrollment in 1959. The neighboring Williams School, which in 1958 had a 48% black enrollment, had a 63% black enrollment after the boundary line change. T. 1370–75.

black school population in the transferor schools. The presence of proportionately more black children in a school than in the neighborhood served by the school may have encouraged white families to move out and discouraged white families from moving in.[15] To some extent then, discriminatory school policies in Wilmington may have affected the relative racial balance in housing and schools in Wilmington and the suburbs.

Finally, in the past few years, the State has subsidized inter-district transportation of students to private and parochial schools. In 1968, the General Assembly passed legislation authorizing a subsidy, to be administered by the State Board of Education, for transportation of pupils enrolled in "nonpublic, nonprofit" elementary and secondary schools. 14 Del.C. § 2905. Although the statute expressly provided that the subsidy would only be available for transportation "within the described boundaries of a public school district and not beyond those boundaries", § 2905(c), the Board of Education thereafter adopted regulations providing a transportation subsidy for private school pupils travel-ing across public school district boundaries. On March 9, 1973, the Attorney General issued an opinion condemning the interdistrict transportation subsidy as a violation of the statute. Thereafter, the General Assembly passed legislation expressly reinstating the subsidy for inter-district transportation of private and parochial students. For the 1973–74 school year, parents of private and parochial students received up to $86 per pupil for such inter-district transportation.[16] The present total expenditure for non-public school student transportation is presently 7–800,000 dollars per year. Before the inter-district subsidy was allowed, the cost was approximately half that amount. By contrast, the total expenditure for public school transportation in Delaware is approximately seven million dollars per year.[17] Since approximately 94% of all private and parochial students are white, the effect of the inter-district subsidy in New Castle County, where 16,535 students attended these schools at the time of trial, is frequently to assist white children residing in Wilmington to attend non-public schools in the suburbs

---

15. A study of Wilmington's Ninth Ward by the State Human Relations Commission discussed the problem of disproportionate black enrollment in a neighborhood's schools as follows:

> In surveys of those selling their homes in the 9th Ward, school problems were mentioned as reasons for leaving—both by those with children, and even by those with no remaining direct contact with the schools.
>
> Specific complaints were "fights with black children", "fear of rape", concern for "safety of the children".
>
> There is no point in arguing that such fears may not be fully rational. The fears are real, even if the threats may not be. And two factors have existed to trigger action on the basis of such fear.
>
> The first factor is a pattern of increasingly large black enrollments in 9th-Ward schools since 1960. In that year, when only 17 black residents were tallied in the entire 9th Ward, P.S. DuPont enrolled 10% black students among its total of 1,500. Four years later, the white enrollment had fallen by 200, while non-white increased 200, for a non-white percentage of 25%. In 1967, against a population in the neighborhood of 15%, P.S.—still with 1,500 students—counted 41% non-white.
>
> Junior high figures parallel these closely; integration started later at the elementary level in the 9th Ward but also produced school enrollments in the 30–45% range by 1967.
>
> The increasing numbers of black students generated white parental fears. But to produce action a second factor was necessary: the existence near-at-hand of systems in which black students were barely present. The Wilmington suburbs—particularly those in the northern sector of the County—provided just such an "escape".
>
> To the extent that these disparate systems function side-by-side, the 9th Ward will continue to be shunned by white parents who for many other reasons would find it a desirable area in which to live. PX 180.

16. Pre-trial Order Stipulations 33–36.

17. T. 2561–62.

and vice versa.[18] To the extent that the subsidy has had an effect on public school enrollment, it has undoubtedly served to augment the racial disparity between Wilmington and suburban public school populations.

As the Supreme Court noted in *Swann,* "People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods". 402 U.S. at 20–21, 91 S.Ct. at 1278. The record in this case is replete with evidence that racial balance in housing is integrally related to racial balance in the public schools. Several realtors testified that sales in the housing market are tied to the characteristics of the schools in the neighborhood: "The first thing you teach yourself is know your school district because you sell houses in New Castle County based on school districts". T. 476. See also, T. 486, 514, 2465. Dr. Karl Taeuber, a demographer, testified similarly that the specific school district is part of the identification of neighborhoods that the general public and the real estate industry use to characterize housing. T. 635–45.

The majority opinion in *Milliken* cited with approval Haney v. County Board of Education of Sevier County, 429 F.2d 364 (8th Cir. 1969), and United States v. Texas, 321 F.Supp. 1043 (E.D.Tex. 1970), aff'd, 447 F.2d 441 (5th Cir. 1971), cert. denied, sub nom., Edgar v. United States, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972). In both cases, uniracial school districts established during the period of *de jure* seg-

regation and maintained as such thereafter were consolidated by court decree for purposes of desegregation. See also, Haney v. County Board, 410 F.2d 920 (8th Cir. 1969). The teaching of these cases is that one-race neighboring or overlapping districts, maintained as such after the demise of statutory school segregation, require desegregation. In New Castle County before *Brown,* the black high school and, to a significant extent, the black elementary schools in Wilmington served black children from the entire County. Unlike the situations in Detroit, where the suburban districts had never been implicated in *de jure* segregation, Milliken v. Bradley, 418 U.S. at 745, 94 S.Ct. 3112, and in Richmond, where suburban districts had participated in *de jure* segregation, but independently from the city school system, Bradley v. School Board of City of Richmond, Virginia, 462 F.2d at 1064–65, *de jure* segregation in New Castle County was a cooperative venture involving both city and suburbs. Although the Wilmington School District was predominantly white at that time, a desegregation decree could properly have considered city and suburbs together for purposes of remedy. At that time, in other words, Wilmington and suburban districts were not meaningfully "separate and autonomous". See also, Wright v. Council of the City of Emporia, *supra,* and United States v. Scotland Neck, *supra.*

Since the 1950's, however, Wilmington and suburban schools have, to a great extent, operated independently of one another. The suburban districts have, for the past several years, operated unitary schools for the children residing within their districts.[19] Neverthe-

18. DX 77; T. 2666.

19. There is no evidence in the record which indicates that suburban schools in New Castle County are presently operating other than unitary schools for the children residing in their districts. See generally, PX 134. In many suburban districts, true desegregation came only after this Court's 1961

decree. In 1962, this Court found racial gerrymandering had occurred in the De La Warr School District. Evans v. Buchanan, 207 F.Supp. 820. In 1965, the De La Warr District was required to undertake desegregation measures by the Department of Health, Education and Welfare pursuant to Title VI of the Civil Rights Act of 1964. In 1965, Iron Hill # 112 and Middletown #

less, because since *Brown* governmental authorities have contributed to the racial isolation of city from suburbs, the racial characteristics of city and suburban schools are still interrelated. The "core" black schools in Wilmington, as we held in our recent opinion, have remained segregated black schools continuously to this day, and most of the Wilmington schools have also become identifiably black. By the variety of federal, state and local conduct detailed above, governmental authorities have elected to place their "power, property, and prestige" behind the white exodus from Wilmington and the widespread housing discrimination patterns in New Castle County. Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Governmental authorities condoned and encouraged discrimination in the private housing market and provided public housing almost exclusively within the confines of Wilmington. The specific effect of these policies was to restrict the availability of private and public housing to blacks in suburban New Castle County at a time when housing became increasingly available to them in Wilmington.[20] Realizing that "to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task'," *id.* at 722, 81 S.Ct. 856, 860, we nevertheless conclude that governmental authorities are responsible to a significant degree for the increasing disparity in residential and school populations between Wilmington and its suburbs in the past two decades.

This conduct constitutes segregative action with inter-district effects under *Milliken.* 418 U.S. at 755, 94 S.Ct. 3112 (Stewart, J., concurring).

## IV

A central issue in this case has been whether, in addition to the foregoing conduct, the Education Advancement Act of 1968 has constituted impermissible inter-district segregation. The Educational Advancement Act was passed by the General Assembly "to provide the framework for an effective and orderly reorganization of the existing school districts of this State . . . ." 14 Del. C. § 1001. Pursuant to the Act, all school districts in Delaware, including the Wilmington School District, became "reorganized school districts". 14 Del.C. § 1005. The key reorganization provisions of the Act provided an exemption of approximately one year from the long-standing requirement in Delaware law that consolidation of contiguous school districts must be approved by a referendum in each of the districts affected. 14 Del.C. §§ 1001–05. In other words, for a limited time, the State Board of Education was authorized to consolidate school districts according to the dictates of sound educational administration and certain statutory criteria. The Wilmington School District was explicitly excluded from the reorganization powers of the State Board by § 1004(c)(4): "The proposed school district for the City of Wilmington shall be the City of Wilmington with the territory within its limits." Wilmington was also excluded implicitly from any consolidation plan by § 1004(c)(2), which lim-

120, segregated black schools located in the Newark and Appoquinimink Districts, respectively, were phased out by the State Board of Education. PX 23K; DX 55.

20. In *Swann,* the Supreme Court noted in a related context:

The failure of local authorities to meet their constitutional obligations aggravated the massive problem of converting from the state-enforced discrimination of racial-ly separate school systems. This process has been rendered more difficult by changes since 1954 in the structure and patterns of communities, the growth of student population, movement of families, and other changes, some of which had marked impact on school planning, sometimes neutralizing or negating remedial action before it was fully implemented.

402 U.S. at 14, 91 S.Ct. at 1275 [footnote omitted].

ited the maximum pupil enrollment in any proposed school district to 12,000.[21]

At the time of the enactment of the Educational Advancement Act, the state public school enrollment was 115,579, comprised of 81% white children and 19% black children. New Castle County, including Wilmington, had an enrollment of 76,223, of whom 83% were white and 17% were black. Wilmington had an enrollment of 15,026, of whom 34% were white and 66% were black. Wilmington was the only school district in New Castle County with a majority black enrollment, and 75% of all black pupils in New Castle County attended school in Wilmington.[22] The only other school district in New Castle County with a proportionately large black enrollment was the De La Warr District, where black pupils comprised 35% of the total enrollment of 4,354. Fully 44% of all black public school pupils in Delaware attended Wilmington schools.[23]

■ We cannot conclude, as plaintiffs contend, that the provisions excluding the Wilmington District from school reorganization were purposefully racially discriminatory. To be sure, all legislators in Delaware in 1968 knew that Wilmington had a large black population, and most legislators may have known that the Wilmington School District was predominantly black.[24] On the other hand, the focus of the legislature's concern in developing the consolidation provisions of the Educational Advancement Act was on small, weak, ineffective school districts, and while the effectiveness of schooling in Wilmington at this time has been disputed, it is clear that Wilmington had larger staffs and better programs than many Delaware school districts.[25] Moreover, Wilmington had historically been treated distinctively in Delaware education, and there is evidence that its representatives were unwilling to forego certain aspects of this special treatment.[26] No language in the provisions at issue makes any reference to race, nor evidently, did the legislative debates over the Act contain any reference to race.[27] Finally, all Wilmington legislators, black and white, voted for the Educational Advancement Act. In short, the record does not demonstrate that a significant purpose of the Educational Advancement Act was to foster or perpetuate discrimination through school reorganization. Effective, as well as intentional racial classifications, however, require special scrutiny under the Equal Protection Clause.

The effect of the exclusions from the State Board's power to develop "an effective and orderly reorganization" of the school districts in Delaware was twofold. First, the two largest districts in the State, Wilmington and Newark, were required to remain intact. Second,

---

21. The Newark School District in suburban New Castle County had an enrollment of approximately 12,000 and was the only other district in Delaware affected by the 12,000 maximum. The Newark enrollment was 97% white, 3% black.

22. Two small districts in Sussex County, Ellendale and Lincoln, with 252 and 233 students, respectively, also had majority black enrollments at this time.

23. All statistics are from or derived from PX 21.

24. Plaintiffs point out, for example, that serious racial disorders occurred in Wilmington in the spring of 1968 and that the National Guard patrolled the City for several months thereafter. T. 953–55.

25. T. 1136–37, 2518–20, 2607–10; PX 210(u), pp. 26–27.

26. T. 2200–04; DX 156–59; T. 2097–98; PX 210(v), pp. 45–48. Not all distinctive features of the Wilmington School District, however, are evidence of the relative autonomy of Wilmington. In 1965, for example, the General Assembly passed legislation giving the Governor power to appoint the members of the Wilmington School Board and repealing the previous system of local elections. 55 Del. Laws Ch. 172. No other school board in New Castle County, except the county-wide Vocational-Technical District, is appointed by the Governor. The Alexis I. DuPont Board of Education is appointed by the Resident Judge of the Superior Court for New Castle County. 14 Del.C. § 1062.

27. DX 166.

in New Castle County, 75% of all black children, who attended school in the only majority black district, could not have been included in any consolidation plan had the Board wished to do so. Plaintiffs contend that the latter effect constitutes a proscribed racial classification.

■ It is well established that any law that classifies groups according to a "suspect classification" is not entitled to the ordinary presumption of constitutional validity.

Under the Equal Protection Clause, this presumption of constitutional validity disappears when a State has enacted legislation whose purpose or effect is to create classes based upon criteria that, in a constitutional sense, are inherently "suspect". Because of the historic purpose of the Fourteenth Amendment, the prime example of such a "suspect" classification is one that is based upon race. See, e. g., Brown v. Board of Education, 347 U. S. 483 [74 S.Ct. 686, 98 L.Ed. 873]; McLaughlin v. Florida, 379 U.S. 184 [85 S.Ct. 283, 13 L.Ed.2d 222]. San Antonio School District v. Rodriguez, 411 U.S. 1, 61, 93 S.Ct. 1278, 1311, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring).

If a statute embodies a racial classification, it can withstand scrutiny under the fourteenth amendment only if its distinctions can be justified by a "compelling" state interest, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and if the State could not have accomplished its goal by less restrictive means. McLaughlin v. Florida, supra; Note, Developments in the Law —Equal Protection, 82 Harv.L.Rev. 1065, 1101–02 (1969).

■ A statute which treats racial problems differently than related governmental interests constitutes a suspect racial classification. In Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L. Ed.2d 616 (1969), the Supreme Court held unconstitutional an Akron city charter amendment which prevented the city council from implementing any ordinance dealing with racial, religious, or ancestral discrimination in housing without the prior approval of a majority of Akron voters. The Court found that the amendment placed special burdens on racial minorities seeking to end housing discrimination compared to those who sought to regulate real property transactions in the pursuit of other ends. The result was "an explicitly racial classification treating racial housing matters differently from other racial and housing matters." 393 U.S. at 389, 89 S.Ct. at 560. In Lee v. Nyquist, 318 F.Supp. 710 (W.D.N.Y.1970), aff'd, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971), a three-judge court held that a New York statute prohibiting state education officials and appointed school boards from assigning students or redistricting to achieve racial balance in school attendance was an invidious racial classification. The court stated:

With regard to all other matters affecting educational policy, the Commissioner has the authority to order local boards to act in accordance with state educational policies as formulated by the Board of Regents. . . . Section 3201(2), however, singles out for different treatment all plans which have as their purpose the assignment of students in order to alleviate racial balance. The Commissioner and local appointed officials are prohibited from acting in these matters only where racial criteria are involved. The statute thus creates a clearly racial classification, treating educational matters involving racial criteria differently from other educational matters and making it more difficult to deal with racial imbalance in the public schools. 318 F.Supp. at 719.

See also, Loving v. Virginia, supra; Bulluck v. Washington, 152 U.S.App.D. C. 39, 468 F.2d 1096, 1116 (1972) (Robinson, J., dissenting).

■■ Hunter and Lee involved statutes explicitly affecting the ability of

governmental bodies to deal with racial matters. Statutes that do not explicitly deal with race but have a pronounced racial effect, however, can also establish suspect racial classifications. In Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1969), the Supreme Court affirmed a judgment of the California Supreme Court that a state constitutional amendment, which included no reference to race, encouraged private housing discrimination, in light of its "historical context", "immediate objective", and "ultimate effect". 387 U.S. at 373, 87 S.Ct. 1627. The Supreme Court has frequently recognized that state electoral districting plans which contain no reference to race are suspect racial classifications if they operate to minimize or cancel out the voting strength of racial minorities. White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Gaffney v. Cummings, 412 U.S. 735, 751, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). Moreover, state administrative procedures having the effect of racial classifications have been held constitutionally suspect, even where there is no explicit policy embodying a racial classification. Hawkins v. Town of Shaw, Mississippi, 461 F.2d 1171 (5th Cir. 1972); Wright v. City of Brighton, Alabama, 441 F.2d 447 (5th Cir. 1971), cert. denied, Hoover Academy Inc. v. Wright, 404 U.S. 915, 92 S.Ct. 228, 30 L.Ed.2d 190 (1971); Kennedy Park Homes Assn., Inc. v. City of Lackawanna, New York, 436 F.2d 108 (2nd Cir. 1970), cert. denied, 401 U.S. 1010, 91 S. Ct. 1256, 28 L.Ed.2d 546 (1971); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2nd Cir. 1968); Hoots v. Commonwealth of Pennsylvania, 359 F.Supp. 807 (W.D.Pa.1973), app. dism., 495 F.2d 1095 (3rd Cir. 1974). In sum, where a statute, either explicitly or effectively, makes the goals of a racial minority more difficult to achieve than other related governmental interests, the statute embodies a suspect racial classification and requires a particularly strong justification.

Several courts have made clear that educational authorities, both North and South, have an obligation to consider the racial consequences of major educational policy decisions, even though a policy favoring integration may not be constitutionally required. In Swann v. Charlotte-Mecklenburg Board of Education, the Supreme Court noted:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities, . . . .

402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

Similarly, Justice Powell, in his separate opinion in Keyes v. School District No. 1, Denver, Colorado, characterized the responsibilities of all school authorities as follows:

> A system would be integrated in accord with constitutional standards if the responsible authorities had taken appropriate steps to (i) integrate faculties and administration; (ii) scrupulously assure equality of facilities, instruction, and curriculum opportunities throughout the district; (iii) utilize their authority to draw attendance zones to promote integration; and (iv) locate new schools, close old ones, and determine the size and grade categories with this same objective in mind. Where school authorities decide to undertake the transportation of students, this also must be with integrative opportunities in mind. 413

U.S. 189, 226, 93 S.Ct. 2686, 2706, 37 L.Ed.2d 548 (1973).

In both Lee v. Nyquist, *supra*, and Hoots v. Commonwealth of Pennsylvania, *supra*, courts held that reducing racial isolation in schools is a legitimate educational goal that promotes the attainment of equal educational opportunity for all children. Thus, in establishing its statewide school reorganization plan, the State Board of Education should have been given the opportunity to consider the impact of redistricting on racial isolation in schools.[28]

■ The Educational Advancement Act, however, precluded the State Board from considering the "integrative opportunities" of redistricting in New Castle County in any meaningful way. Because the vast majority of black school children and the only identifiably black school district in New Castle County were excluded from the reorganization powers of the State Board, the Board could not have significantly reduced the growing racial isolation in New Castle County schools had it chosen to do so. Section 1003 of the Act enjoined the Board to adopt explicit reorganization criteria in the following areas of legitimate educational concern: "topography, pupil population, community characteristics, transportation of pupils, use of existing school facilities, existing school districts, potential population changes and the capability of providing a comprehensive program of efficient and effective education." To the extent that "racial characteristics" was effectively excluded from this list of legitimate educational criteria for reorganization, the exclusion of Wilmington from the Board's power under the Educational Advancement Act constitutes a suspect racial classification.[29]

■ That the Newark District was also excluded from consolidation by the terms of the Educational Advancement Act[30] does not mitigate the racially specific effect of the Act. This Court's recent opinion held that at the time the Educational Advancement Act was enacted, the State Board had not yet satisfied its obligation to eliminate the vestiges of *de jure* segregation in the Wilmington schools. Whether or not the Board would have been required to adopt a desegregation plan beyond the boundaries of Wilmington in the absence of the Educational Advancement Act, it is clear that the Act made consolidation promoting racial balance substantially less accessible than other educational strategies. Because the Educational Advancement Act, racially neutral on its face, had a significant racial impact on

28. Indeed, as a matter of educational policy, it would have been reasonable to expect the State Board to consider the possibility of consolidating Wilmington with neighboring districts. For example, a survey team from New York University School of Education recommended in June, 1967 consolidation of all suburban districts with Wilmington in order to "resolve Wilmington's *long-term* problems—vocational, social, or educational." DX 68, p. 81. On the other hand, the record does not suggest that, but for the statutory exclusion from its reorganization authority, the State Board would necessarily have consolidated Wilmington with any other district.

29. To be sure, consolidation of Wilmington with neighboring school districts is still possible by a referendum approved by a majority of the voters in each district affected. 14 Del.C. § 1027. The mere availability of resort to a referendum, however, does not justify a racial exclusion from the power of governmental officials. Hunter v. Erickson, *supra*, 393 U.S. at 392–393, 89 S.Ct. 557.

Not only did the Educational Advancement Act exclude Wilmington from the State Board's one-year reorganization powers, but its reasonable and foreseeable result was to reduce the likelihood that suburban districts would consolidate with Wilmington in the future. The Conrad and Mount Pleasant Districts, for example, were expanded "outward" making them less likely candidates for voluntary consolidation "inward" with Wilmington.

30. A letter of October 18, 1968, from the State Superintendent to the members of the State Board of Education states:

"A limit of 12,000 pupils was inserted [in the Educational Advancement Act] to avoid consolidating any other district with Wilmington." PX 154(a).

the policies of the State Board of Education, it constitutes a suspect classification.

 Three governmental interests have been asserted as providing "compelling" justification for the exclusion of Wilmington from school district reorganization. First, the drafters of the Educational Advancement Act believed that under the Delaware Constitution no statute could alter the boundaries of the Wilmington School District unless passed by a two-thirds majority of each house of the General Assembly. T. 1813–15, 2190–99, 2232–35, 2416. The supporters of the Act, therefore, favored exclusion of Wilmington in order to secure passage. Even assuming that the purported constitutional requirement could be a compelling interest justifying the exclusion of Wilmington,[31] this Court can only conclude that as a matter of law, no two-thirds majority requirement existed. Article IX, Section 1 of the Delaware Constitution, Del.C.Ann., provides in relevant part: "No general incorporation law, nor any special act of incorporation, shall be enacted without the concurrence of two-thirds of all the members elected to each House of the General Assembly." Defendants argue that because the Wilmington City Charter, which includes a provision specifying the boundaries for the Wilmington School District, was a special act of incorporation adopted by a two-thirds vote in 1905, a like majority is required to change the Wilmington district boundaries. However, in In re School Code of 1919, 7 Boyce 406, 108 A. 39 (Del.Sup. 1919), the Supreme Court of Delaware held to the contrary:

> The General Assembly is required by article 10 to provide for the establishment and maintenance of a general and efficient system of public schools, but there is no requirement that legislation thereunder shall have the concurrence of two-thirds of each House. . . . [School districts] are agencies of the State government, created for the purpose of aiding in carrying out the requirements of the Constitution respecting the establishment and maintenance of a public school system and may be altered or abolished by the Legislature at any time. We must, therefore, assume, that any legislative act that constitutes a part of the general system of public schools, including acts incorporating school districts, and Boards of Education, requires only the concurrence of a majority of all the members elected to each House.

108 A. at 42.

This reasoning was reaffirmed in an advisory opinion by that Court on the constitutionality of school bonds pursuant to the Educational Advancement Act. Opinion of the Justices, 246 A.2d 90 (Del.Sup.1968). Compare, Opinion of the Justices, 252 A.2d 164 (Del.Sup. 1969). In short, the Delaware Constitution did not require a two-thirds majority for passage of a statute making the Wilmington School District eligible for consolidation, and an erroneous belief to the contrary cannot be constitutionally "compelling".

 A second interest advanced by the defendants is that the Wilmington city and school district boundaries have been coterminous for many years. It is undisputed that the establishment of the Wilmington city limits as the school district boundary in 1905 was racially neutral. It is also beyond question that the Wilmington School District had frequently received special legislative and administrative treatment prior to the enactment of the Educational Advancement Act. While historic community

---

31. As a matter of law, however, political expediency cannot be a compelling state interest justifying a racial classification. See, Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958); Buchanan v. Warley, 245 U.S. 60, 80–81, 38 S.Ct. 16, 62 L.Ed. 149 (1917).

boundaries[32] should be given substantial weight by a court reviewing legislative districting decisions, the Wilmington school district boundaries were historically permeable. For many years, students from throughout New Castle County attended school in Wilmington, and the only black high school in the County, Howard, was located in Wilmington. In the 1954–55 school year, for example, approximately 1,100 pupils (roughly 9% of the total Wilmington enrollment that year) from suburban New Castle County attended Wilmington schools as transfer students. PX 157. For many years, vocational-technical, hearing impaired, blind, orthopedically handicapped, and pregnant students have crossed the Wilmington school boundaries to attend special educational programs. Pretrial Order, Stipulations 37–39. Moreover, as noted previously, the General Assembly has passed legislation expressly to subsidize the inter-district transportation of private and parochial school students; students crossing the Wilmington district lines to attend private or parochial schools were not excluded from the subsidy. Thus, the Wilmington School District limits have frequently been disregarded in the name of educational interests thought to be overriding. Furthermore, no other city boundaries in Delaware were incorporated into the Educational Advancement Act. This Court cannot conclude, therefore, that maintenance of the historic Wilmington district intact constitutes a compelling state interest justifying the exclusion in the Educational Advancement Act.[33]

Defendants next assert that district size is a compelling justification for excluding Wilmington from reorganization under the Educational Advancement Act. Even if Wilmington had not been excluded expressly from the State Board's reorganization powers, it, as well as the Newark School District, was excluded by § 1004(c)(2) of the Act, which provided: "Each proposed school district including more than one component former school district shall have a pupil enrollment of not less than 1900 nor more than 12,000 in grades 1 through 12." The legislature's reason for imposing a maximum size limitation on reorganized districts was succinctly articulated by Representative Heckert, Chairman of the House Education Committee:

> The criteria were put in specifically so that we didn't evolve into large unwieldy districts. At that time there was terrible trouble in the large school districts all across the country with demands for community control, which I sympathize with, because the essence of the Democratic process is, you don't want a district so large that the people whose children go to that school feel they cannot control it.
> T. 1086.

In other words, the 12,000 limitation embodied a legislative judgment that if the State Board were allowed to create larger districts, the districts might well be administratively unmanageable and might lack community involvement in education.[34]

---

32. There are no geographic barriers separating Wilmington from the surrounding communities and geographic boundaries have not been asserted by the defendants in support of the exclusion of Wilmington from the Educational Advancement Act.

33. It is noteworthy that "existing school districts" was one of the factors that the State Board was required to consider in drawing up its reorganization plan. 14 Del.C. § 1003. Thus, the historic distinctiveness of the Wilmington School District could have been considered by the State Board in deciding whether to consolidate Wilmington with other districts, had not the legislature conclusively exempted Wilmington from the Board's consideration. In this respect, the legislature's goal of deference to the historic Wilmington boundary might have been achieved by a less restrictive means.

Furthermore, this Court found in Sincock v. Gately, 262 F.Supp. 739, 824–26 (D.Del. 1967) (three-judge court) that the historic political boundary of Wilmington did not justify the disparities between Wilmington and suburban legislative districts in Delaware's reapportionment plan.

34. See also, T. 228, 1097–98.

Dr. George Kirk, Superintendent of the Newark School District, testified that educators in Delaware generally felt that the optimal maximum size for a school district is "somewhere in the vicinity of 8 to 15, maybe 20,000 students." T. 224.[35] Dr. Kirk also testified that there is considerable debate nationally among educators as to the desirable maximum, but that there is a consensus around 30,000 students. T. 225–226, 260–65, 269–72. See also, Final Report of the State Board of Education Advisory Committee on School District Reorganization, May, 1967, DX 97. Dr. Gordon Foster, Professor of Education at the University of Miami, Coral Gables, Florida, and a specialist in educational administration, testified that recent research indicates that districts having enrollments larger than 75,000 students seem to require decentralization whereas districts smaller than that figure do not. T. 1433–38, 1643–50. Finally, Dr. Richard Gousha, formerly State Superintendent of Public Instruction, testified that the Milwaukee School District, of which he is presently superintendent, can be effectively administered even though the total enrollment is approximately 125,000. T. 2637–39.

In short, there is substantial disagreement among professional educators as to the desirable maximum size for school districts. In these circumstances, a decision that reorganized school districts should not have enrollments greater than 12,000 is certainly rational, but a substantially greater maximum district size would also be rational. This Court cannot find the statutory maximum enrollment sufficiently compelling to justify the racial classification in the Educational Advancement Act. No state interest in small school districts required the legislature to prevent the State Board from balancing district size

against other legitimate criteria in drawing up a reorganization plan.

■ Neither the purported requirement in the Delaware Constitution, nor the interest in preserving a historic school district boundary, nor the interest in maintaining districts with enrollments below 12,000 is compelling, individually or cumulatively. Accordingly, the language of the Act excluding Wilmington from consideration by the State Board for reorganization violates the Equal Protection Clause.

■ Moreover, the unconstitutional exclusion of Wilmington from eligibility for consolidation plainly constitutes an "inter-district violation" under Milliken v. Bradley. Justice Burger, writing for the majority, stated the pre-requisite for a cross-district remedy as follows: "Specifically it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of inter-district segregation." 418 U.S. at 745, 94 S.Ct. at 3127. Here, the racially discriminatory exclusion of Wilmington prevented the State Board from considering whether sound educational principles dictated a consolidation of Wilmington with other school districts. But for this racial classification, the Board may have consolidated Wilmington with other New Castle County districts, with the result that the racial proportions of the districts would have been altered significantly. Even though the State Board may not have been required to alter the Wilmington District, this Court cannot find that the exclusion from the Board's powers was racially insignificant. On the contrary, the reorganization provisions of the Educational Advancement Act played a significant part in maintaining the racial identifiability of Wilmington and the suburban New Castle County school districts. In

---

35. Nothing in the Educational Advancement Act placed a limit on the growth of school districts. Indeed, by the 1973–74 school year, the total enrollment of the Wilmington district had declined to 14,688, while the Newark district had become the largest district in the State, with an enrollment of 16,477. PX 15. By 1985, the Newark district is expected to have an enrollment of 28,000. T. 270.

short, the General Assembly "contributed to the separation of the races by . . . redrawing school district lines," Milliken v. Bradley, at 755, 94 S. Ct. at 3132 (Stewart, J., concurring).[36]

V

■ Having determined that the applicable law authorizes consideration of inter-district as well as Wilmington-only remedies for school segregation in New Castle County, this Court will proceed to evaluate the alternative plans to be submitted by the parties. In devising an appropriate remedy, this Court will be guided by the cautionary language of *Milliken*: ". . . the remedy is necessarily designed, as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." at 746, 94 S.Ct. at 3128. The victims of the discrimination are the school children of Wilmington. This Court cannot speculate on the scope of the proper remedy.[37] In light of the language in *Milliken* stressing the mechanical infeasibility of inter-district desegregation in Detroit, however, it is appropriate to note certain differences between the schools in New Castle County and those in Detroit.

The New Castle County population is less than one-tenth that of the Detroit metropolitan area; Wilmington's is one-nineteenth that of Detroit. The proposed *Milliken* remedy would have involved three counties and fifty-four school districts; any remedy here would be confined to New Castle County and, at most, twelve school districts. There were 779,000 students in the Detroit "desegregation area", but there are only 87,696 in all of New Castle County.

As discussed previously, provision for inter-district school attendance is contrary neither to Delaware tradition nor experience. The Educational Advancement Act provided for statewide consolidation of districts. The Act's drafters devoted significant time and effort to developing mechanics for school district consolidation in Delaware. See, e. g., 14 Del.C. §§ 1005–1010, 1027–1028; T. 1090.

Because of Delaware's history and demography, inter-district arrangements short of consolidation have been essential to education, and they continue today. The relative sparsity of suburban population required suburban districts until the 1950's to pool their white students with Wilmington, and with each other,[38] and to concentrate many of their black students in Wilmington. Even today there is a County-wide Vocational-Technical School District, and there are special schools located in individual districts which draw their students from all County districts.

To facilitate inter-district programs, the State has employed a voucher system. All district funds are kept by the State Treasurer in a district account in a Dover bank. Transactions between districts and between the State and dis-

36. School district reorganization pursuant to the Educational Advancement Act amounted to educational redistricting. Invidious discrimination in such redistricting is perforce an "inter-district violation". The Educational Advancement Act "redrew" the Wilmington School district lines by removing the existing Wilmington boundaries from the State Board's discretion at the same time that other school districts in Delaware were eligible for consolidation.

37. The dissent expresses the view that our additional findings will "necessarily end in some form of interdistrict busing of students, both into and out of Wilmington . . . ." Our request for both Wilmington-only and inter-district plans makes it clear that we do not subscribe to that view.

38. For example, children of high school age in the Alfred I. DuPont District were transported, at State expense, either to Wilmington or the Alexis I. DuPont District. T. 1118, 2108–11. To the extent that children in suburban districts were sent to other districts equipped with high schools, "local control" included control of the education of high school students from "sending" districts by parents of children in "receiving" districts. See also, Note, 26, *supra*.

tricts are effected by voucher between such accounts. Most educational programs in Delaware are funded by the State through the voucher system, at different levels: transportation (100%); major capital construction (60%); annual operating budget (70%).[39]

The mechanics of an inter-district remedy here would pose few administrative problems of first impression. The inter-district history of Delaware education is different from that of large geographical areas with regional populations sufficient in size to have been traditionally independent. While district consolidations were not unusual in Michigan, it was never necessary there to reorganize districts on a state-wide basis; nor did geography make it necessary to devise attendance schemes there on a county-wide basis.[40]

### VI

In conclusion, we have found (a) a historic arrangement for inter-district segregation within New Castle County, (b) significant governmental involvement in inter-district discrimination, and (c) unconstitutional exclusion of Wilmington from consideration for consolidation by the State Board of Education, pursuant to reorganization powers now lapsed.

Accordingly, we hold:

1. Those provisions of the Educational Advancement Act of 1968, 14 Del. C. § 1001 et seq., excluding the Wilmington School District from eligibility for consolidation are hereby declared unconstitutional.

2. The parties will be ordered to submit to the Court alternative plans to remedy the segregation found by the Court in this opinion and in the opinion of July 12, 1974, (a) within the present boundaries of the Wilmington School District, and (b) incorporating other areas of New Castle County.

Submit order.

LAYTON, Senior District Judge (dissenting):

1. Findings of Fact

Following an evidentiary hearing, the majority has made sweeping findings of fact relating to discrimination in school affairs, real estate transactions and public housing. It is found that in the past 20 years there has been a striking demographic change in residential population which has substantially affected school attendance patterns; that Wilmington is now heavily black; that as of 1954, many suburban blacks attended schools in Wilmington and suburban whites did the same, and that subsequent to *Brown I* (although these interdistrict attendance practices were ended), Wilmington schools became identifiably black; that nearly all schools in Wilmington which were formerly white and segregated are now identifiably black; that racial disparity between city and suburbs was brought about by such governmental actions as the publishing of an F.H.A. mortgage manual in 1936 which advocated racial and economic homogeneity of neighborhoods; that these racial neighborhood patterns were further encouraged by the F.H.A. as late as 1949 by the manner in which it issued mortgages; that State and local government has also been responsible for residential segregation; that Wilmington still maintains an identifiably dual school system, and that the State encourages the attendance of white Wilmington students at suburban private and parochial schools.

These findings, superficially read, would seem to make out a case in support of Plaintiffs' charges of interdis-

---

39. Pre-trial Order, Stipulations 24–30.

40. It has already been noted that the entire County here "is smaller geographically and has approximately the same enrollment as the Charlotte-Mecklenburg district which was involved in *Swann I* and *Swann II*." Evans v. Buchanan, 379 F.Supp. at 1230 (Opinion of Gibbons, J.). Additionally, the County contains no geographic barriers—a significant problem in the Charlotte-Mecklenburg district.

trict discrimination through State action. More carefully examined against the evidence, I find in them nothing of sufficient substance to be the basis for an interdistrict remedy.

### Schools

Findings to the effect that prior to 1954 there were interdistrict transfers of black and white students from the suburbs into Wilmington which affect present-day school attendance are, to may mind, a *non-sequitur*. The majority acknowledges, but gives no significance to, the reasons for such arrangements—that two decades ago, Wilmington had better educational facilities, full twelve-grade programs, etc. They acknowledge that these practices have not existed for years. But, finding that after the termination of these interdistrict transfers Wilmington's schools became identifiably black, the majority apparently infers that the present black population is in part the result of such transfers. There is no evidence to support such a conclusion.

*Milliken* has made irrelevant to interdistrict relief our July 12 finding that Wilmington's schools retain vestiges of the former dual system. The Plaintiffs have pointed to no specific causal relationship between the existence of such vestiges and the relative racial composition of city and suburban schools, and the majority has made no concrete findings in this regard.

The only finding of any substance is that the State still supports transfers of students out of Wilmington to private and parochial schools in the suburbs. Even though blacks are not excluded from this program, and apparently neither are suburban students, it can reasonably be argued that it tends to discourage white students in Wilmington from attendance in Wilmington schools.

### Real Estate

There are a number of findings having to do with discrimination in real estate transactions. The finding that the great increase in black population in Wilmington in the past 20 years is, in part, due to assistance, encouragement and authorization by governmental policies is, in my opinion, a conclusion unsupported by real, credible evidence. The Federal Housing Administration practices alluded to were terminated more than 21 years prior to commencement of this action.[1]

Real estate agents testified that racial discrimination still exists in real estate sales. Others denied this. There was "manufactured" evidence of white owners allegedly refusing to sell homes after finding that the potential purchasers were black. The real estate salesmen directly concerned bitterly denied this. Wisely, the majority gives no weight to such evidence. However, ˙the findings do note that the Recorder of Deeds of New Castle County accepted for recording deeds which contained racially restrictive covenants. And the Code of Ethics of the National Association of Real Estate Boards, which was reprinted by the Delaware Real Estate Commission, contained a statement cautioning realtors from "introducing into a neighborhood . . . members of any race or nationality, or any individuals whose presence will clearly be detrimental to property value. . . .

My impression of this evidence at the conclusion of the trial was (and still is) that it fell flat. Much of the record concerns circumstances which are not the result of State action. The majority concedes that twenty-seven years ago the Supreme Court declared racial covenants contained in deeds to be of no legal effect.[2] The majority cites no authority requiring the Recorder of Deeds to cull out and delete this sort of material from

---

1. By "this action," I refer to the 1971 petition for supplemental relief in this case, which originated in 1957.

2. Shelley v. Kraemer, *supra.*

the numerous deeds filed daily for recording; nor does it attribute any specific legal significance to failure to cull out such language. In my judgment, the only hard evidence of State action appearing in the mass of evidence dealing with real estate discrimination is the State publication, until 1970, of the N. A.R.E.B. Code of Ethics. Moreover, this Code was not exclusive to Delaware; presumably it extended nationally from Maine to Georgia, and from Washington, D. C. to California.

*Public Housing*

Finally, there were a number of findings concerning racial discrimination in public housing. In the main, these findings show that little or no public housing has been built in suburban New Castle County, but that in Wilmington, which is heavily black, over 2,000 units have been erected. The inference is that this tends to confine blacks within city limits.

The Court also finds: "The several attempts by the County Housing Authority to fund public housing developments at suburban sites have met with vigorous opposition from neighborhood groups and have been unsuccessful in gaining the necessary rezoning or site approval from the New Castle County Council." This finding, on the one hand, virtually concedes that failure of the New Castle County Housing Authority to create public housing in the County is due to private, not State, action; but on the other hand, it leaves the unsupported inference that the fault lies with the County Council. Not a word is said as to the reasons why the necessary rezoning permission was withheld; how many petitions were filed; why they were denied; and whether, upon denial, appeals were taken.

In my view, the majority's findings, so sweeping in effect, so heavy with inferences but so lacking in concrete, relevant substance, have fallen far short of fixing the responsibility for interdistrict racial discrimination upon Defendants'

shoulders. What the majority does not face up to is that there seems to be no definitive explanation for the huge tide of black immigration into the nation's cities, and the white flight therefrom, in the past two decades. One theory based upon persuasive logic is that the cause is economic; that thousands of blacks have left the South and other predominantly rural areas in the past twenty years out of a natural desire to seek the better job opportunities and higher wages available in the cities. There they have settled and, as is true of most ethnic groups, have tended to band together.

Other thinking on this subject is that there simply is no definitive answer to the situation. The Fourth Circuit Court of Appeals, in language which with little change would, in my judgment, reflect exactly what has happened in Wilmington, has said:

"We think that the root causes of the concentration of blacks in the inner cities of America are simply not known and that the district court could not realistically place on the counties the responsibility for the effect that inner city decay has had on the public schools of Richmond. We are convinced that what little action, if any, the counties may seem to have taken to keep blacks out is slight indeed compared to the myriad reasons, economic, political and social, for the concentration of blacks in Richmond and does not support the conclusion that it has been invidious state action which has resulted in the racial composition of the three school districts. Indeed this record warrants no other conclusion than that the forces influencing demographic patterns in New York, Chicago, Detroit, Los Angeles, Atlanta and other metropolitan areas have operated in the same way in the Richmond metropolitan area to produce the same result. Typical of all of these cities is a growing black population in the central city and a growing white population in the surrounding suburban and rural areas. What-

ever the basic causes, it has not been school assignments, and school assignments cannot reverse the trend. That there has been housing discrimination in all three units is deplorable, but a school case, like a vehicle, can carry only a limited amount of baggage. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. at 24, 91 S.Ct. 1267, 28 L.Ed.2d 554." [3]

In any case, I cannot agree that the disparity in residential and school populations between Wilmington and its suburbs is the result of discriminatory State action.

## II. The Educational Advancement Act.

The majority has further found the Educational Advancement Act unconstitutional. But as the Court said in *Milliken*, ". . . without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy." [4] Even if the Act unconstitutionally specified that Wilmington's historic boundaries not be disturbed, I fail to see how this changed the *status quo* so as to have interdistrict effect. [5]

In any event, I question the conclusion that the EAA, in re-establishing the lines of the city coterminously with the district, constituted a suspect racial classification. These district lines were not "deliberately drawn on the basis of race." *Milliken*, at 745, 94 S.Ct. at 3127. The majority concedes that "(w)e

cannot conclude, as plaintiffs contend, that the provisions excluding the Wilmington District from school reorganization were purposefully racially discriminatory." They go on to say that ". . . the record does not demonstrate that a significant purpose of the Educational Advancement Act was to foster or perpetuate discrimination through school (district) reorganization. . . . (T)he focus of the legislature's concern in developing the consolidation provisions of the Educational Advancement Act was on small, weak, ineffective districts . . . ."

Actually, the EAA did not establish new boundary lines for Wilmington. It maintained existing lines—lines which had existed for ¾ of a century and were based upon a reasonable and rational conclusion that a school district of approximately 15,000 was about the right size for effective administration. These lines historically had given Wilmington certain educational perquisites which it could afford and did not wish to surrender. [6] The only duty owed Plaintiffs, as I see it, was to see that the Wilmington district maintained a unitary school system (which it has not done—but the remedy for this has been set in motion by our July 12 opinion). Failure of the EAA to correct this violation, in the context of the goals and scope of the Act, does not, in my view, constitute a suspect classification of black Wilmington students. [7] My conclusion is that the

3. Bradley v. School Board of City of Richmond, 462 F.2d 1058, 1066 (4 Cir. 1972). *See Milliken*, 418 U.S. at 756 n. 2, 94 S.Ct. at 3133 (concurrence of Justice Stewart), and *Keyes*, 413 U.S. at 222–224, 93 S.Ct. 2686 (concurrence of Justice Powell).

4. 418 U.S. at 745, 94 S.Ct. at 3127.

5. T. 1171–72, 1835–36, 2311. *See* n. 12 and text thereto, *infra*.

6. See n. 13 and text thereto, *infra*.

7. In this respect, this case is similar to Bulluck v. Washington, 152 U.S.App.D.C. 39, 468 F.2d 1096, 1106–07 (1972), rehear. den. There, the Court found a Congressional choice to educate certain students outside of the District of Columbia to *affect* a racial

group, but not to classify it *racially*. Thus, the classification—that of students not granted "extra-territorial" education—was upheld by application of the "rational basis" test, rather than the "compelling state interest" test. Here, Wilmington and Newark, classified according to size, were effectively removed from State Board discretion for the one year consolidation period, so were treated differently from all other State districts. Considering the primary goal of the Act—to rationalize district size and administration—failure to provide affirmatively for integration of one of the cities classified according to size did not serve to classify that city (Wilmington), or its residents, according to race. Thus, the classification should survive scrutiny if rationally based, which the ma-

EAA is not unconstitutional; but even if it is, it has had no interdistrict effect.

III. Alternate Findings.

The findings of fact and conclusions of law by the majority, with which I have already expressed disagreement, will in my view necessarily end in some form of interdistrict busing of students, both into and out of Wilmington, a result contrary to that arrived at in Milliken v. Bradley. Thus, anything further I may say will be only a cry in the dark. However, I should very briefly like to say this: were my view of the facts to control, I would find that—

(1) Prior to *Brown I* Delaware, a "border state", was, beginning a few miles south of Wilmington at the Delaware and Chesapeake Canal and extending down to its southern border, a rural area embodying many southern manners, traditions and customs;

(2) It maintained a *de jure* dual system of schools;

(3) Nevertheless, upon the advent of *Brown I* and *II*, Wilmington promptly dismantled its dual school system so that within a few years a black student could attend the school of his choice to the extent which seemed to comply with the commands of the Supreme Court;[8]

(4) In the lower counties there remained identifiably white and black schools, with white teachers for white schools and vice versa, separate schools for Moors, and varying kinds of school districts—Special, State Board and High School Attendance;[9]

(5) Dr. Gousha, a forward-looking educator, became State Superintendent of Schools in 1964 and accepted the challenge of gradually attempting to terminate this hodge-podge of black and white districts in the lower counties through vigorous administrative action. With the assistance of Dr. Row and others, and with the exercise of extreme tact as well as the cooperation of the State School Board, the program of dismantling the dual system in the two southern counties was finally accomplished by 1967;[10]

(6) At that time it was believed by the responsible authorities, including HEW, that the dual system of schools in the State had been substantially eradicated. In fact, HEW pointed to Delaware as the first border state which had "completely eradicated the dual system."[11] Nor did these Plaintiffs, the NAACP, or other organizations, including the Wilmington School Board, indicate to the contrary;

(7) Even so, there remained very small districts, very large districts, some strong districts and some weak districts, and it was generally agreed that the school districts in the State, with the exception of Wilmington, needed consolidation;[12]

(8) Wilmington was a unique district. Its boundaries had been coterminous with the City for more than 60 years. It was a wealthy district and maintained a fine system of schools. It enjoyed certain perquisites such as the right to certify its own teaching staff and was regarded by many local educators as about the right size for efficient administra-

jority concedes it was. It should be noted that the EAA also eventually left undisturbed the existing boundaries of six other Delaware districts, four in New Castle County (Alfred I. DuPont, Alexis I. DuPont, Claymont, and DeLaWarr), and two in Sussex County (Laurel and Seaford). PX 21, 31; DX 39, 65, 66.

8. T. 1496; DX 11, 21, 139, 165. In our July 12 opinion, we found vestiges of that system still to exist. However, the identifiably black nature of Wilmington's present school population is due primarily to the large proportional increase in Wilmington's black population since *Brown I* and *II*.

9. T. 2096–2102, 2108–11.

10. T. 2134–38, 2587–2604; DX 50, 51, 52, 56.

11. T. 1797–98, 2606–07; DX 60.

12. T. 1136–37, 2607–08; PX 210(f) p. 15, 210(u) pp. 26–27.

tion.[13] As the majority stated in its findings, elsewhere, the "focus of the legislature's concern in developing the consolidation provisions of the Educational Advancement Act was on small, weak, ineffective districts," not the Wilmington District;

(9) With patience, determination and the loyal support of many legislators as well as private citizens, the EAA was gradually formulated, polished and repolished.[14] In the Legislature it was saved from crippling amendment by a single vote. It was the most important piece of education legislation ever passed in Delaware.[15] All Wilmington legislators, including two who testified on behalf of Plaintiffs, voted for it. As the majority found, ". . . the record does not demonstrate that a significant purpose of the Educational Advancement Act was to foster or perpetuate discrimination through school reorganization." No voice was raised by any of these Plaintiffs, their counsel, or any other body in opposition (on these grounds) when it passed in 1968, and no suit was filed challenging its constitutionality until the present action was begun some three years later. In fact, at the time this action was filed, the Wilmington School Board was not a party to it.[16]

(10) The Legislature still furnishes funds for the transportation of students from Wilmington to private and parochial schools in outlying districts. Black Wilmington students and students from other districts may take advantage of this program. Blacks, as a matter of sheer economics, have not been able to take advantage of this kind of interdistrict transportation on any large scale. However, the number of students who do participate is noticeably decreasing.[17]

(11) The Wilmington School District is infinitely smaller than that of Detroit. However, a study of the relevant statutes discloses that school districts in this State are at least as autonomous as in Michigan, and the two state systems of education are quite. similar in most respects.[18]

IV. Conclusion

In light of my view of the facts, it is my considered judgment that Milliken v. Bradley should govern the result in this litigation.

Both Detroit and Wilmington maintained and still maintain dual systems of schools[19], but such constitutional violation has had no effect on any other district. The two school systems are quite similar and the school districts surrounding each city have committed no unconstitutional act having any effect on each other or on the two city districts involved. Each school board in Delaware has the power to collect additional taxes and issue bonds, and a number of districts do both.[20] Each district is relatively autonomous in the manner in which it operates its schools. To order an interdistrict transfer of students in this litigation would result, although concededly in a smaller way, in the necessity for this Court to solve many "complex problems" and in a sense be the "'school superintendent' for the entire area." [21] The EAA is not, in my opin-

---

13. 23 Del.Laws Ch. 92, 32 Del.Laws Ch. 163; T. 249–51, 1155–56, 1989–90, 2098, 2122–23; PX 210(v) pp. 46–48, DX 68 pp. vi–ix.

14. T. 1099–1102, 1138–1147, 1163–68, 1772–73, 2388–93, 2515–17, 2611.

15. T. 1103, 1148–49; PX 183 p. 3.

16. T. 1154, 2613–14, 2618–19.

17. T. 2655–2667.

18. This is not inconsistent with the finding of this Court and the Third Circuit that the State Board is responsible for all phases of desegregation in Delaware. See 14 Del.C.

§§ 1010, 1026–27, 1043, 1048–50, 1055–57, 1091, 1304, 1401, 1902, 2102–03; T. 1832; PX 210(g) p. 27. Compare 418 U.S. at 742 n. 20, 94 S.Ct. 3112.

19. The constitutional violations incident to the maintenance of the dual system in Detroit are far more serious and numerous than in Wilmington.

20. The actual details and number of districts levying additional taxes and having outstanding bond issues were not made part of the record.

21. 418 U.S. at 744, 94 S.Ct. at 3127.

ion, unconstitutional; but, if so, it has no interdistrict effect. Viewing the record as a whole, I do not regard the furnishing of funds for an interdistrict transfer of students to parochial and private schools as sufficiently serious to take this case from the purview of Milliken v. Bradley.

In all important respects except size, the facts of *Milliken* and this case are strikingly similar. But *Milliken* is not a rule of size; it is a rule of law. Had this Court the option (which, pre-*Milliken*, appeared available to many courts) of curing *de jure* segregation by assigning students to schools in the surrounding districts, this could probably be done relatively easily here, although with considerable expense and interference in the administration of other school districts. But our task is to determine whether or not that approach, proscribed in *Milliken*, is available here. I find no constitutional violation in this case which would form the basis for an interdistrict remedy. I would direct that our recent opinion of July 12, 1974, be supplemented by a plan for the elimination of the dual system of education in Wilmington.